## THE VEENDAM.[1]

### AMERICAN PETROLEUM CO. *v.* THE VEENDAM.

*(District Court, S. D. New York.   June 5, 1891.)*

SALVAGE—BROKEN SHAFT—TOWAGE—FOG—SERVICE ENDED BEFORE REACHING PORT.
　　The steam-ship V., with cargo and freight worth $375,000, and 600 passengers, on a voyage from Rotterdam to New York broke her shaft 900 miles east of Halifax. La F., in answer to signals of danger, took her in tow for 3 days, when the V., having repaired her shaft, steamed ahead, outran La F., and became lost in the fog about 9:30 P. M., not renewing signals, or seeking to keep La F.'s company. The next morning La F., not being able to find the V., and supposing her to have gone ahead, resumed her voyage.   A half hour after the V. disappeared in the fog her shaft again gave way, and after 24 hours delay it was again repaired, so as to enable her to steam into port.   La F. was worth $200.000.   The towage was in part through fog, and in circumstances of special danger.   *Held*, (1) that the service

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

rendered was of a salvage nature; (2) that the acts of the V. amounted to a termination by her of the salvage service before reaching port; that La F. fulfilled her duties; that there was no abandonment by her of the salvage service; and $8,500 was awarded her.

In Admiralty.

*Wheeler, Curtis & Godkin*, for claimant.

*Wing, Shoudy & Putnam*, for libelant.

BROWN, J. The above libel was filed to obtain compensation for salvage services rendered by the libelant's steam-ship La Flandre, a three-masted tank steam-ship of about 1,509 tons net register, valued at $200,-000, to the respondent's mail and passenger steam-ship Veendam, on a voyage from Rotterdam to New York in May, 1891. The Veendam is a large steamer, 432 feet long by 40 feet beam, and of 2,209 tons net register. Her value, with cargo, freight, and passenger money, was $375,000. On this voyage she had 600 passengers, besides officers and crew about 100. At about 2:30 P. M. of May 15th her shaft broke, when she was about 1,350 miles from New York, and about 900 miles due east from Halifax. Preparations were made to attempt to repair the shaft, and signals for help were given. On the morning of May 16th, the lights of La Flandre being reported, additional signals of distress by rockets and by flags asking assistance were displayed. In answer to these signals, La Flandre went along-side of the Veendam, and was requested to take her in tow. One end of the Veendam's hawser of about 90 fathoms was drawn to La Flandre, and the other end was shackled to the Veendam's anchor cable. The compressor of the Veendam's windlass broke, causing 150 fathoms of the anchor chain to run out before it could be stopped, and the outboard weight was too great for the Veendam's windlass to heave it in again. At 9:30 A. M. on the 16th La Flandre commenced to tow, making about 4½ knots per hour, her speed being impeded by the great drag of the anchor chain. The weather was hazy, the sea favorable. The towing continued until half past 10 o'clock P. M. of Sunday, May 17th, when, it appearing by soundings that they had reached the Grand Bank, they stopped, and the Veendam took in 100 fathoms of chain. After an hour's delay the towing was resumed. There was then thick fog, which grew more dense towards morning. Fog-horns on fishing vessels were heard, sometimes close aboard, and the most careful watch was necessary. At 5 A. M. on Monday, the 18th, a fishing vessel was so close under La Flandre's port bow as to require her to port her helm. The Veendam also ported hard, and before they came into line again the towing hawser parted. The fog was then so thick, and the danger of going on so great, that both vessels anchored, about three lengths apart. The distance towed during the previous 48 hours was about 191 miles. During all this time endeavors to repair the Veendam's shaft had been going on, and at half past 11 on the 18th it was reported to La Flandre that the temporary repairs would soon be complete, and that an attempt would be made by the Veendam to start under her own steam, which was done at 3:30 o'clock that afternoon.

Captain Roggeveen, of the Veendam, signaled La Flandre to follow him, which she did, making about one knot per hour less speed than the Veendam. At 6 P. M. the latter, to avoid stopping her engine, returned towards La Flandre, and signaled that her engine worked well. At 9:30 P. M. a light fog coming on, the Veendam was lost sight of. No other signals for assistance being seen or heard, La Flandre continued during the night on a course W. by S., as directed by the Veendam's master. At daylight the Veendam was not to be seen, and, after steaming about for over an hour, the master of La Flandre, concluding that the Veendam required no further assistance, and had gone ahead of him, resumed her course to Philadelphia, where she arrived on May 24th, having lost a little over two days' time in the performance of these services. In fact, however, about 10 P. M. of the 18th, half an hour after the Veendam was lost sight of in the fog, one of the repair couplings gave way, compelling another stop of about 24 hours, when, the couplings being again repaired, and secured by additional chains, the Veendam resumed her course, and, making about $8\frac{2}{3}$ knots per hour, arrived without further difficulty in New York at 10 A. M. of May 25th.

1. I cannot doubt that the services rendered in this case were of a salvage nature, as distinguished from ordinary towage. That subject has been several times considered in this court. Such services are treated as salvage when rendered to a disabled ship with the obvious purpose of relieving her from circumstances of danger, either present or reasonably to be apprehended, and not merely to expedite her passage. *The Saragossa*, 1 Ben. 552; *The Emily B. Souder*, 15 Blatchf. 185; *McConnochie* v. *Kerr*, 9 Fed. Rep. 50, 53; *The Plymouth Rock*, Id. 413, 416. The sails of the Veendam were not sufficient for safe navigation in her situation. She was 900 miles from the nearest port, and during the 12 hours before La Flandre was sighted she made only about $1\frac{1}{2}$ knots per hour under sail. Her ability to make repairs to her shaft secure enough to proceed under her own steam-power was evidently uncertain, and could only be determined by trial, and she had 600 passengers on board. The situation was, therefore, manifestly one of reasonable apprehension of danger. A disabled steamer in mid-ocean is not in a safe place, or in a safe condition. The signals of distress and the call for help so imported, and I cannot doubt that the service which the one party asked and the other gave was understood by both to be of that salvage nature which ordinarily belongs to a towage service rendered in answer to signals of distress to disabled steamers at sea.

2. It is objected that La Flandre did not tow the Veendam into port, or to a place of safety, and that when her shaft gave out the second time she was in as much danger as at first; so that La Flandre is not legally entitled to salvage compensation, because not successful. *The Edam*, 13 Fed. Rep. 135; *The Algitha*, 17 Fed. Rep. 551; *The Aberdeen*, 27 Fed. Rep. 479. The principle invoked is elementary. It is applied when the ship is lost, or when the attempt to rescue her is abandoned. In the cases cited, the salvors voluntarily abandoned the service. Here the

ship was saved, and the service was not voluntarily abandoned. On the contrary, La Flandre, from the time she entered upon the service, diligently performed all the duties of her undertaking, and followed strictly the directions of the Veendam's master. She lost sight of the Veendam, not by any act or neglect of her own, but because the Veendam ran away from her, out of sight and out of reach of communication, after receiving all the help she wanted, or was willing to wait for. The Veendam thereby terminated the salvage service by her own act, and took the risk of what might follow.

It is not essential to a salvage service that the salvors should attend the vessel aided into port. On principle, it is sufficient that the needed help be given so long as is necessary; that is, until the apprehended danger is overcome, whether the service terminates in port or at sea. The code of the country to which this ship belonged (Netherland Code, § 561) recognizes this principle in providing salvage remuneration where ship and cargo "are brought either to a safe place at sea, or into a safe port." When, as in this case, the peril arises from disabled machinery, and from the doubt whether it is possible for the ship to make temporary repairs, compensation for salvage services is earned if the services are continued as long as the vessel requires them, *i. e.*, until the repairs are so complete that the vessel is no longer in danger, because fully able to take care of herself. In the case of *The Great Eastern*, N. Y. Trans. Nov. 13, 1864, (cited in *The Alaska*, 23 Fed. Rep. 604,) a mechanical engineer, who was a passenger on board, received a salvage award of $15,000 for making her broken rudder serviceable, which he did in 24 hours after her master and officers had tried in vain to repair it. It would not be contended that the salvor in that case would have been any the less entitled to reward had he come from another vessel, and departed as soon as his service was complete. The main question there arose from the fact that the salvor was a passenger on board, and so remained. The salving vessel is not required to attempt to hold possession unnecessarily of the other vessel, or to persist in attending her into port, to the manifist embarrassment and possible danger of both, merely to preserve his right to legal compensation for what he has already earned. Nor can there be any doubt, I think, of the right of the aided vessel, when all danger is really past, to discharge her salvor from further service, without prejudice to the latter's right of compensation, or to the lien therefor, though port is not yet reached. Whether in a given case all danger is past or not, must be for the masters of the vessels themselves to decide. In cases of doubt the salvor might, indeed, be unwilling to relinquish the vessel, though the latter, possibly for the sake of diminishing the salvage compensation, might wish to take the risks of the rest of the voyage, and discharge the salvor from further service; but if the salvor acquiesced, or could not prevent it, the assisted vessel at least could not complain if she terminated the service when she chose. In the present case there was no intent on the part of La Flandre to abandon the salvage service, nor was she explicitly discharged by the master of the

Veendam from further service. As respects the right of salvage compensation, however, I think the circumstances are practically equivalent to such a discharge. It is evident from the testimony that when the service was entered upon the amount and duration of the expected service were uncertain. Efforts were making to repair the shaft, which might or might not prove successful. The engineer had reported that it 'would be a great job to mend it, but he would try it." La Flandre also had scarcely sufficient coal to tow the Veendam into New York in case bad weather was encountered. The service was undertaken without determining whether, in case the repairs should be ineffectual, La Flandre hould tow the Veendam into New York or into Halifax, or transfer her to some other vessel; while, if the repairs should prove successful, she could proceed by her own power. At about half past 11 on Monday morning, after two days' service, and while the vessels were at anchor in the fog, the chief officer of the Veendam came on board La Flandre, and "reported that the repairs were nearly complete, and would be ready for trial some time in the afternoon, and requested La Flandre to wait until that time." Capt. Roggeveen testifies that the officer brought back word that La Flandre "would wait; that we were to try the shaft." On getting up steam about 3 o'clock, they found, after a quarter of an hour's trial, that the shaft worked well, and thereupon went ahead, signaling La Flandre to follow till next morning, and to steer W. by S.

"*Question.* You were uncertain at that time as to whether you would break down again or not? *Answer.* I was uncertain. That same afternoon I went too far out of sight, up to six o'clock; then I went back. I signaled him to follow me, but we went out of sight. He could not steam as fast as we could. *Q.* What did you do? *A.* I went back the same course again, and signaled him our engines worked well. We could not stop. I thought he would think it very strange that we went out of sight, without telling, after I signaled him that he must follow us till the next morning. *Q.* Why could you not stop? *A.* Because it was better for the broken shaft that it should not have any shock. It turned out that it didn't break with the shock. *Q.* But you didn't care to take any chances? *A.* No, sir."

Before starting, the engineer had reported to the captain that "he felt sure about it; it would be a good thing." The captain of the Veendam does not testify that when he went back to La Flandre about 6 P. M. he requested him to follow until the morning, but only that he signaled to La Flandre that "his engines worked well. They could not stop," and he says the reason for going back was because he thought La Flandre "would think it very strange that they went out of sight without telling, after he had signaled to follow him until the next morning." The fair inference from this testimony would be that he turned back to take courteous leave of La Flandre, and to discharge her from further service. The master of La Flandre, however, testifies that when the Veendam came back about 6 P. M., besides signaling that the engines worked well, and that they could not stop, she added, "Follow me on a W. by S. course until the morning." Both agree that the direction to follow on a west by south course was given about the time they started. Whether

or not the same signal was repeated, as the master of La Flandre states, when the Veendam turned back at about 6 P. M., is perhaps uncertain. It is plain that La Flandre acted upon that understanding, and observed it. If the Veendam, however, had really desired to keep in company of La Flandre, no reason appears why she did not do so by easing slightly the speed of her engines, to accommodate herself to the speed of La Flandre, if she did not wish to continue their connection by hawser. The liability to fog at night was obvious, yet no provision was made for the contingency of separation, nor were any signals arranged for a common understanding. At 9 P. M., when the fog again came on, the Veendam was four miles away from La Flandre, yet no efforts were made to approach her, nor were any signals given to her, such as would then naturally have been given if her longer attendance was desired or expected. Even if the last direction was to follow W. by S. till morning, there could have been but little likelihood that they would again sight each other after being once separated in fog at such a distance, and going at different speeds. The repaired shaft had worked satisfactorily for over six hours, and that was calculated perhaps to strengthen the master's confidence in his ability to proceed without further help. Whether such was his actual intention at that time or not, the conduct of the Veendam was practically equivalent to it. She voluntarily ran away from La Flandre, and placed herself beyond reach, and beyond communication with her, without any fault on the part of the latter, and while the latter was observing the directions understood to have come from the Veendam. The next morning, when the Veendam, after an hour's search, was not to be found, La Flandre had no reason for going back, and was justified in concluding that the Veendam had intentionally parted company, and on her own responsibility had gone on to New York. It was the Veendam, therefore, that terminated the salvage service at the time it was terminated, and not La Flandre. It was the Veendam that took the risk of subsequent accident, if any; and as the Veendam reached port in safety in part through the service of La Flandre, it does not lie with her to dispute La Flandre's right to a reasonable salvage compensation.

3. Had the service in this case been continuous until the arrival of the Veendam at New York, either with or without aid from the Veendam's engines, the salvage compensation awarded, considering the value of the Veendam, with her freight and cargo, and 600 passengers aboard, might have been as much as $25,000, if the somewhat similar cases of *The Daniel Steinman,* 19 Fed. Rep. 918, and *The Italia,* 42 Fed. Rep. 416, were followed. The much shorter service of La Flandre, however, the special circumstances and expectation of both the parties under which the service was begun and rendered, to which I have referred above, as well as the fact that the service was terminated while the Veendam was still far from port, materially diminish the amount that should be awarded in the present case. Upon the special facts of each case, the amount should be fixed with reference to these two controlling principles, viz., the com-

pensation must be sufficiently liberal to induce valuable ocean steamers to turn aside willingly, and without hesitation, to aid vessels in distress; but not so large as to lead disabled steamers to run unjustifiable risks of life and property rather than incur the cost of salvage assistance. And so, when a salvage service has been properly sought and rendered, no encouragement should be given to any unseasonable termination of the service by the assisted vessel before reaching port, or to her incurring unjustifiable hazards for the purpose of reducing the salvage award to a minimum, by denying a full and fair measure of compensation for all that the salvor has done. Per Mr. Justice BRADLEY in *The Suliote*, 5 Fed. Rep. 101. *The Daniel Steinman*, 19 Fed Rep. 918, 921; *The Alaska*, 23 Fed. Rep. 597, 613.

The towage of vessels at sea is usually a dangerous service, and in towing amid the fogs of the Grand Bank these dangers are greatly increased. Ordinarily that would be the most perilous part of an entire towage from the place of this accident to New York. The evidence shows the presence of those difficulties and dangers to La Flandre. An award of $1,000 in this case, as suggested by the claimant's counsel, would be so wholly inadequate, considering the value of the property at risk, both of the salved and salving vessel, as, if generally adopted, to put an end speedily to all salvage assistance at sea, except from motives of humanity. On the whole, I think that $8,500 will, in the present case, be a proper award, for which sum a decree may be entered, with costs. Of this award, three-fourths will go to the owners, and one-fourth to the master, officers, and crew. Of the latter, $500 will go to the master; the remainder to the officers and crew in proportion to their wages.