## J. W. McKIM CORPORATION v. WHELAN et al.

(Circuit Court of Appeals, Eighth Circuit. September 21, 1925. Rehearing Denied December 4, 1925.)

No. 7008.

1. Trusts ⬤⟿372(1)—Plaintiff suing several defendants to establish trust in oil properties has burden of showing knowledge of all defendants of agreement under which it claims.

In action against several defendants to enforce trust on certain oil and gas leases or interests arising from agreement between plaintiff's assignor and one of defendants, plaintiff has burden of showing knowledge on part of other defendants of agreement between their codefendant and plaintiff's assignor.

2. Trusts ⬤⟿372(3)—Evidence held insufficient to establish knowledge of all defendants of alleged agreement between one of their number and assignor of plaintiff.

In action to establish trust on certain oil and gas properties, evidence held insufficient to show that all defendants knew of agreement between one of their number and plaintiff's assignor on which plaintiff based its claim.

**3. Mines and minerals ⬟97—Evidence held to establish partnership arrangement in oil speculation enterprise broad enough to cover particular titles.**

Evidence, in action to establish trust in oil properties, *held* to show ·partnership arrangement for joint venture in oil speculation and development enterprise broad enough to include dealings relative to particular titles.

**4. Mines and minerals ⬟101—Antenuptial agreement assigning oil promoter's interest in particular titles held fraudulent as to partner in joint enterprise.**

Unrecorded antenuptial contract assigning oil promoter's interest in particular titles *held* fraudulent as to one engaged in joint enterprise with promoter, and ineffective to convey more than assignor's actual interest.

**5. Appeal and error ⬟717—Opinion of District Court, while entitled to great consideration, is not finding of fact and is not binding on Circuit Court of Appeals.**

Opinion of District Court, while entitled to great consideration, is not finding of fact and is not binding on Circuit Court of Appeals.

**6. Costs ⬟61—Plaintiff prevailing against one only of several defendants in suit to establish trust held liable for only equitable proportion of cost.**

Plaintiff in suit against several defendants to enforce trust on oil properties successful only as to one defendant *held* not taxable with whole cost, but only with an equitable proportion.

Appeal from the District Court of the United States for the District of Wyoming; T. Blake Kennedy, Judge.

Action by the J. W. McKim Corporation against John W. Whelan and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded as to named ·defendant; otherwise affirmed.

Fred R. Wright, of Denver, Colo. (Charles F. Tew, of Denver, Colo., on the brief), for appellant.

Henry E. Lutz, of Denver, Colo., for appellee Gates.

John W. Lacey, of Cheyenne, Wyo. (Herbert V. Lacey, of Cheyenne, Wyo., on the brief), for appellee J. W. Whelan and certain other appellees.

Before KENYON and BOOTH, Circuit Judges, and AMIDON, District Judge.

KENYON, Circuit Judge. Appellant was plaintiff in the trial court, and appellees were defendants. For convenience we shall so designate them. ·

The action was brought to enforce a trust ·upon certain. oil and gas prospecting leases or permits including the benefits therefrom, issued by the Department of the Interior under what is commonly known as the Leasing Act of February 25, 1920 (Comp. St. Ann. 'Supp. 1923, §§ 4640¼–4640¼ff, 4640¼g–4640¼ss), on certain oil-bearing lands in the Salt Creek oil field in Wyoming; plaintiff claiming that its assignor, J. W. Mc-·Kim, made in the late summer or early fall of 1919 a joint arrangement with defendant Whelan, under which the said McKim and Whelan were to share equally the profits that might accrue through leases or permits for oil to be secured in said Salt Creek field by virtue of the Leasing Bill then pending in the Congress, and which was subsequently passed. ·

The alleged agreement covered three objects which may be expressed as follows:

(1) To secure contracts for casing head gas in Wyoming, Oklahoma, Texas, and Louisiana, and to secure the erection of plants to extract gasoline from casing head gas.

(2) To acquire titles to lands in the Salt Creek oil field in Natrona county, Wyo., which would give them the right to secure leases or permits from the government under what was known as the "Oil Leasing Bill" which was then pending before Congress, and which was approved on February 25, 1920, and in general to obtain leases or operating contracts in said field.

(3) To acquire oil and gas leases and rights near Fort Sumner, N. M., on what was then known as the "Elliott-Holman Project," and otherwise. It was agreed that they were to divide whatever proceeds should come from any of these enterprises equally; McKim to devote his attention particularly to the engineering feature of the projects, and Whelan to the legal features.

Defendants Whelan, Plummer, Scott, Boeke, and Gates denied the alleged joint venture agreement between McKim and Whelan, admitting that certain permits or leases were obtained from the Interior Department after the passage of the Leasing Bill on what is referred to throughout the record as the Dorsett titles (hereinafter explained), but claiming that the leases or permits were not obtained by or in the interest of Whelan, but that they were independently secured through the efforts of defendants Scott and Plummer, with the financial aid of defendant Gates; Boeke and Whelan being employed by Plummer merely as attorneys to assist in negotiating for the locators' claims in the Salt Creek field, and in presenting the matter of securing the lease to the Department of the Interior.

The profits, concerning which this controversy arises, came from oil developed from the lands designated as the Dorsett titles. The trial court decided the issues in favor of defendants and taxed to plaintiff as part of the costs 1 per cent., amounting to $1,497, on the total amount that had been paid into court at the time of final decree.

The matter in controversy arises out of the situation in the Salt Creek oil field in Natrona county, Wyo. The laws of the United States permitted the location of placer claims in 160-acre tracts by associations of 8 or more persons, and allowed such associations to locate unlimited acreage. Different groups located on different lands, and that is how the terms, "Shannon group," and "Dorsett group," arise in this case; both groups having filed on a part of the field.

Most of these placer claims in the course of time passed into the hands of the larger companies, the leading one being the Midwest Oil Company. This field was subsequently withdrawn from entry by executive order of the President, and in the year 1919 there was pending in Congress what was known as the Leasing Bill, the purpose of which was to permit the development of the oil fields by allowing permits and leases to be granted by the Department of the Interior. The bill provided against the allowance of what is termed "excess acreage"; no one person or corporation being permitted to hold exceeding 3,200 acres.

The so-called Dorsett and Shannon applications pressed by Plummer (who had secured contracts with relation thereto from the heirs) before the Department of the Interior under the Leasing Bill were resisted by the Midwest Oil Company and the Wyoming Associated Oil Corporations. This resulted in a compromise in regard to the Dorsett applications by virtue of which two permits, which are in evidence, covering approximately 200 acres of the Salt Creek field, were issued to the Midwest Oil Company and the Wyoming Associated Oil Corporation, and by them were assigned to Plummer with the consent of the Department of the Interior. McKim claims to have had no knowledge of this until about April 11, 1921, when he demanded of defendants Plummer, Boeke, Whelan, and Scott an interest in the permits and the proceeds derived from the oil development thereunder.

The Dorsett interests were the locators' interests of Daniel H. and Daniel B. Dorsett which had never been transferred by them. Some of the same parties were locators on both the Shannon and the Dorsett lands. As to the land covered by Permit No. 025,883 no application had been filed thereon by defendants. It was granted by way of compromise with the Midwest Company. The Department of the Interior found the equities against the Shannon heirs and no permit was issued on that title.

It is plaintiff's claim that Plummer in securing these leases or permits was acting as the agent of Whelan, while defendants claim he secured the same for the benefit of five parties jointly, viz., Plummer, Gates, Boeke, Scott, and Whelan, and that McKim had nothing whatever to do with the matter.

Wheeler and Parker subsequently secured the one-eighth interest retained by the Dorsett heirs in their contracts with Plummer, and agreements were made with defendants Carter Oil Company, Inland Oil & Refining Company, and Fensland Oil Company for the development of the property. The rights of these parties are not in dispute and need not be considered. Likewise the rights of Hawkins and Salt Creek Triangle Syndicate.

It appeared subsequent to the bringing of this case that defendant Whelan had made an antenuptial agreement with his wife, Eugenia Marie Whelan, which purported to convey all of his right, title, and interest in the Dorsett titles to her, and that she had made an assignment of the same to the Wyoming National Bank of Casper to secure an antecedent indebtedness. Mrs. Whelan and the bank were therefore made parties in the case by a supplemental complaint.

Defendant Plummer executed July 27, 1920, to seven of the defendants a trust agreement based upon his seven-eighths interest derived from the Dorsett heirs, defining the respective interests as follows: John C. Shaffer, 30 per cent.; John W. Whelan, 12 per cent.; Chiles P. Plummer, 12 per cent.; John T. Scott, 12 per cent.; Richard M. Boeke, 12 per cent.; Herman B. Gates, 12 per cent.; Henry A. Lindsley, 10 per cent. Defendants, Shaffer and Lindsley were added to the original five for certain reasons hereafter referred to. The rights of Shaffer and Lindsley are not in controversy here, as it appears from the record that the issue between plaintiff and them has been adjusted.

The defendants particularly concerned are Scott, Gates, Boeke, Plummer, and Whelan. The matter will be simplified by a process of elimination as to some of these defendants. It is without dispute that defendant Gates advanced approximately $15,000 to

carry on the work of securing these leases or permits. There is no contention that he should not participate in the profits. Apparently he knew nothing of any agreement made between McKim and Whelan, or of any claim of McKim. We think, also, that the record does not show any knowledge on the part of defendant Scott of any arrangement entered into between Whelan and McKim. The decree as to these two defendants was correct, and we shall not extend this opinion by a discussion of the evidence with relation thereto.

The real controversy here is between plaintiff and defendants Plummer, Boeke, and Whelan, and the questions involved are entirely fact questions. We have carefully read and considered the voluminous evidence in this case. It cannot be harmonized. It is a labyrinth of contradiction. Many of the stories told are improbable. There is much of evasion. It shows a pathetic lack of memory in many instances, or an unusual economy of truth. There are many circumstances in the record which might tend to arouse in the ordinary mind a suspicion that Plummer, Boeke, and Whelan were, as claimed by the plaintiff, acting together to deprive McKim of his interest in the one profitable part of the enterprise, viz., the proceeds from the Dorsett leases. In view of the fact that these three parties in the town of Casper, Wyo., occupied the same office, dividing the expense thereof, and, while not partners, were evidently somewhat associated in their work, and further in view of the notoriety of the situation as to the Salt Creek field, it is difficult to believe that the matter of securing leases or permits thereon under the Leasing Bill was not fully and frequently discussed by them, or that Boeke and Plummer were ignorant of the arrangement between Whelan and McKim. The testimony of witness Nichols is significant as to this. McKim had been his client, and noticing McKim going to Whelan's office joked about it with Plummer, and was told by Plummer that Whelan and McKim were together on some sort of deal in which they were to make a lot of money, and that it was the Salt Creek situation. Reference may be made also to the testimony of witness Wheeler as to a conversation with Plummer on July 3, 1920, in which he tried to explain to him the one-eighth reserved interest and whether it was royalty or working interest, and Plummer said: "To tell you the truth, I don't know the difference, but I will call in Whelan, who has drawn all the papers and promoted this deal, and he can tell you." This was after Plummer and Whelan had been interviewing both Dorsett and Shannon heirs in the East and had secured the Dorsett contracts, and after the time that Plummer had undertaken with Gates' financial help the securing of assignments from the Dorsett heirs. Also there is the story of Mr. Plummer as to the method by which Gates was taken into the transaction; his agreement to furnish $15,000 against Plummer's time; the suggestion some time thereafter by Plummer to take in Whelan and Boeke and split the profits five ways instead of between Plummer, Gates and Scott, and the readiness of Gates' assent thereto. Again the taking of more than $600 of the Gates' money to investigate the Shannon titles without any right so to do, as under Plummer's evidence Gates had not then been taken in on the Shannon titles; the peculiar situation developed in the evidence as to Plummer and Boeke, viz., Plummer under his testimony being one of the lawyers in the Shannon matter with no arrangement as to what he was to receive, becoming such lawyer after the Dorsett assignment to him had been secured, and he was a principal in the Dorsett matter; while as to Boeke the situation was reversed, he being a principal as to the Shannon titles with no knowledge of or agreement as to what he was to receive, and a lawyer on the Dorsett titles and could be discharged at will as counsel for the Dorsett interests, although he was to have a share in the profits (under the statements of the trust certificate of July 27, 1920, each had an interest in both titles); further the fact of Plummer traveling with Whelan in the East, introducing Whelan as his partner, and working on the Shannon titles in April and May, 1920, as shown by the depositions of the Shannon heirs, and taking some of the Shannon trusteeships in his name, one contract being changed from Whelan to Plummer as trustee for reasons, as testified to by Strong, "best known to themselves." It seems strange that in the conversation of January, 1920, between Whelan, McKim, and Boeke with reference to the Salt Creek titles, Boeke sat by and said nothing while Whelan was making arrangements as to the procuring of the abstracts, though Boeke claims to have been one of the original discoverers of the alleged Shannon defects; further the testimony of Boeke that Whelan told him he had sent Plummer to Washington on Dorsett titles, while Plummer testifies he went on his own initiative.

[1, 2] These may all be referred to as cir-

cumstances in the record which lend weight to the contention of plaintiff that these three defendants were in a conspiracy to usher McKim out of any part of the proceeds of the Dorsett titles. Such circumstances naturally are productive of suspicion. On the other hand, there is abundance of evidence in the record to show that the defects in titles bringing about the leases and permits were discovered by defendant Scott, and that the proceedings to secure the same were financed by Gates and carried on by Plummer with Bocke's assistance, and without knowledge of any claim of McKim. In view of the fact that the burden was on the plaintiff to show knowledge on the part of defendants Plummer and Bocke as to any arrangement between McKim and Whelan, the evidence on said question being rather evenly balanced, and the further fact that the witnesses were before the court which found against plaintiff's contention, we have decided we would not be warranted in disturbing the conclusion of the court as to these two defendants.

[3] We turn our attention therefore to the controversy as between plaintiff and defendant Whelan concerning which a different situation presents itself. The foundation of plaintiff's claim is, as before pointed out, an alleged agreement made between McKim and Whelan in the town of Casper, Wyo., in the late summer or early fall of 1919, before the so-called Leasing Bill was passed by the Congress. The trial court was of the opinion that the only enterprise contemplated in the first talk of McKim and Whelan related to casing head gas and excess acreage, and that neither the Dorsett nor the Shannon titles came within the scope of casing head gas or excess acreage. Undoubtedly the latter is true, and yet the subject of excess acreage must be considered as bearing on the situation, as without doubt the limitation of holdings in the Leasing Bill, viz., 3,200 acres, was persuasive in bringing about a situation where the Midwest Oil Company and the Wyoming Associated Oil Corporation were willing to forego serious contention to sustain their own applications and to consent to permits to others based on the Dorsett titles. It is apparent also that at the time of the conversation between Whelan, Bocke, and McKim in January, 1920, when McKim inquired of Whelan as to whether there was anything available in the Salt Creek district, and Whelan called in Bocke and Bocke exhibited memoranda relating to both the Dorsett and Shannon titles, that something more

than excess acreage was being considered. Many matters were covered in the original conversation with Whelan, and among them was the question of obtaining leases in Salt Creek in case the bill passed. The scope of the agreement appears from McKim's evidence, some of which we quote:

"I told Mr. Whelan that I thought I could obtain information through various sources I knew of, and might be able to arrange with them whereby we could acquire a lease or find out how to acquire one. Mr. Whelan told me that he had already talked to some people regarding how some leases could be acquired. We had some conversations along the same line. It is not necessary to tell all of them, I suppose, but I opened negotiations in regard to the information relative to leases or titles in Salt Creek, and I think, in order to make it clear, it should be said that in the course of these conversations between Mr. Whelan and myself, the matter of acquiring leases in New Mexico came up. They were all linked. * * *

"In this conversation, after the remarks of Mr. Whelan, I said that it was also my impression that there would certainly be opportunities to acquire leases in Salt Creek, in case that bill passed, and that as I testified yesterday I thought I might be able to get some information about what could be done, and also might be able to do something material towards acquiring leases or permits or whatever was obtainable, what course we found to be the one to take, and then said to Mr. Whelan, 'Now, this matter is going to develop as it appears to you and I, and you want to undertake to get in there under that situation, and I do, and we both think we can assist one another, the only thing that I can see for us to do is to make an agreement to work jointly on the matter,' or words to that effect. 'You look up anything that you think would lead, might lead to the acquirement of any leases, or give us information whereby we would know of someone else who would acquire a lease, and with whom we might negotiate to either operate the property or form a company on it, or make some kind of a business arrangement with them, and I will do the same, and here the situation is so very uncertain —nobody knows what the developments are going to be, if any, the only possible arrangement for us to make is for—A.—would be for us to arrange for a fifty-fifty basis, and whatever was acquired by one or the other of us, for the joint efforts, or however it occurred, the proceeds would be fifty-fifty as the only possible arrangement. Mr.

Whelan said he agreed with me on that, that there was no other way that it could be undertaken at that time, and I said, 'Well, if you feel that way and you want to undertake it, and I want to, shall we do so?' and he said, 'Yes,' and it was then that I started to make inquiries from the Midwest people. * * * (—) Well, I said, 'Well, if you think that way about this Salt Creek situation, and I think that there is something there, what is the matter with us trying to get something in there, and do something about it?' He said, 'That is all right, that suits me.' 'Well,' I said, 'Now suppose we do undertake to do that, how are we going to do it?' I said, 'I don't know how we will do that.' He said, 'We will start to see what we can find about the titles out there, about who is likely to have these lands or likely to get an interest in them. We have got to see everybody we can, apparently, if we are going to get anywhere.' And I said, 'Now, suppose that we follow a line like that, that you and I want to acquire anything out there, or find out about it, and see if we can get anything there, as to combining our efforts to get the benefits, if you want to combine efforts on that kind of a thing, how will we do that? The situation is so indefinite at this time, we don't know what is going to be available, we don't know the status of the titles; we don't know how they can be conveyed, or how they can be acquired; therefore, the only thing that we can do is to use our best efforts jointly and severally for the benefit of both of us; and whenever either or both of us succeed in getting an interest it will be fifty-fifty between us. Then Whelan said, 'Of course, that is the only way we can do such a thing as that.' 'Well,' I said, 'all right, suppose we undertake it that way?' 'Do you agree to that? Do you want to do it that way?' and he said 'Yes, I do.' I said, 'All right, then, let's do that. We can start right away. I will go down to Denver shortly on this gas proposition, and while down there I will make this investigation.' "

It is of no particular importance whether the law as to excess acreage in the Leasing Bill brought about the adjustment by which permits were secured as to the Dorsett titles, or whether it was brought about "through following up investigations and that sort of thing" as stated in part of the conversation between Whelan and McKim. If McKim's evidence is true, then the arrangement between them contemplated among other matters a joint venture in securing leases or permits from the Secretary of the Interior on oil lands in the Salt Creek territory if the Leasing Bill was passed by the Congress, and the net proceeds derived from the development thereof were to be divided on the basis of fifty per cent. to each. There is direct conflict in the testimony between McKim and Whelan, but we are satisfied that the circumstances surrounding the matter and the evidence disclosed in the entire record sustain the contract as claimed by McKim. That some arrangement was entered into between them is apparent. It must be conceded under the evidence that it covered at least the New Mexico matter, the casing head gas proposition, the Cat Creek holdings, and the so-called Shannon title in the Salt Creek territory. The strongest corroboration that Mr. McKim and Mr. Whelan were partners in the Salt Creek Oil enterprise is the evidence of Mr. Hansen, a disinterested party. We refer thereto. In a conversation at the Brown Palace Hotel in Denver March 11, 1920, Whelan was introduced to Hansen by McKim as his partner in the enterprises which McKim had theretofore discussed with Hansen. These parties were together in Denver about two days and discussed many ventures, including the Wild Cat oil venture in New Mexico, the casing head gas proposition, negotiations with the Frantz Corporation in relation to the Cat Creek matter in Montana, and the securing of leases on certain oil lands in the Salt Creek field in Wyoming. According to Mr. Hansen, Mr. Whelan explained to him how they expected to secure titles to ground in Salt Creek territory, and stated that he had a representative in the East searching for the owners or the original claimants of title thereto, and that if these contracts could be secured relief was possible under the Leasing Bill. They discussed the terms under which they would go into this and other enterprises, and Whelan distinctly excluded the gas plant which he had in Salt Creek, and admonished witness Hansen that his connection with the Salt Creek title proposition would be purely in a financing capacity. It was contemplated that if the Salt Creek titles were secured they would go into an operating company, and that McKim and Whelan would be remunerated for their part in bringing about the arrangement; that they had spent money on these enterprises, and if any deal was made to turn them over to a new company Whelan and McKim were to share alike.

Afterwards there was another meeting in Denver on the 14th of May, 1920, between

the same parties, at which time Whelan acquainted McKim with the fact that he had taken in defendant Shaffer on account of his influence in the Department of the Interior, and he with his lawyer was to have 40 per cent. of the profits. Whelan also stated what he had done in the East, and explained to McKim that he had given an interest to Mr. Gates and had promised an interest to Boeke. It is apparent that all of the various things in which McKim and Whelan were interested were discussed in Hansen's presence, and that Hansen understood from the conversations, as any one would from reading the testimony, that McKim and Whelan were working together and were partners in the New Mexico, the casing head gas, and the Salt Creek matters. The exhibits introduced in the case show much correspondence between McKim and Whelan concerning the New Mexico and other matters. Little is said in the correspondence concerning the Salt Creek matter, but it is referred to in some of the correspondence, and McKim at least in some of the telegrams was inquiring as to it. It is not entirely clear whether these refer to the Eureka-Wyoming matter which was an excess acreage proposition, or to the securing of leases. They could refer to either. Further, after the alleged arrangement with Whelan, McKim took up the question of Salt Creek titles with some of the officers of the Midwest Oil Company and others, and for a while was fairly active in relation thereto. He seems to have paid more attention, however, to the New Mexico proposition and other parts of the venture than to Salt Creek, while Whelan paid more attention to the Salt Creek matter. McKim was a geologist and Whelan a lawyer, and the division of work was natural. It is to be noted that at the very time of the March conversations in Denver in which Hansen, Whelan, and McKim participated, Whelan had been, according to his and Plummer's testimony, employed as a lawyer by Plummer to help in bringing about a consummation under the Leasing Bill of permits or leases by virtue of the Dorsett titles, and nothing was said by him in the Denver conversations of this fact. His connection with the other defendants in the prosecution of the Dorsett titles was kept a secret from McKim.

Much is said throughout the record and in argument as to the differentiation of the Shannon and Dorsett titles. It is urged by defendants that they were separate and distinct matters. We do not think they were. Both titles were involved in the Salt Creek

field. Some of the same locators appear as to each. Whelan and Plummer worked on both. Plummer claims in his testimony that he knew nothing of the Shannon matter until April, 1920. After that time, however, he was as diligent on one as the other. At the time of the conversation in Whelan's office in the latter part of January, 1920, he exhibited to McKim memoranda showing the defects in the Shannon title, and some in the Dorsett titles. Both were discussed as a part of the same transaction. If McKim's interest was only in the Shannon title there was no need of discussion as to the Dorsett titles. There was no necessity for this conclusion, as testified to by Whelan, that the Dorsett titles were "no good." The declaration of trust drawn by attorney Lindsley of July 27, 1920, defines the interests of Shaffer, Plummer, Scott, Boeke, Whelan, Lindsley, and Gates in both the Shannon and Dorsett titles, and makes no distinction between them. Lindsley appeared to fully understand that both titles were part of the same enterprise. Unless the Dorsett and Shannon titles were a part of the same transaction, it would be difficult to ascertain from the record how Shaffer and Lindsley ever got into the Shannon matter. Further, the depositions of the Dorsett and Shannon heirs show that in their conversations with Whelan and Plummer both titles were treated as parts of the same transaction. The Shannon title was just as much a club to use as the Dorsett titles, and the object of the enterprise apparently was to club the oil companies into some kind of settlement to get rid of the nuisance of the claims. It is interesting in this connection to note that the first parties visited after Plummer secured the Dorsett heirs' contracts seem to have been parties connected with the Midwest Oil Company.

We think the evidence conclusive that defendants treated the two sets of title as parts of one enterprise. We see no reason for differentiating them. The trial court evidently felt that this was true up to the time of the conversation in Whelan's office in the latter part of January, 1920, between McKim and Whelan. As to this the court said: "In the opinion of the court this is where the Dorsett and Shannon titles became separated and remained continuously separated thereafter, except as they were subsequently brought together under a trust agreement among the other defendants."

We do not give the same construction to this conversation as the trial court did. Of course, it would be entirely possible that Mc-

Kim might elect to prosecute only the Shannon title and abandon any interest in the Dorsett titles. The very fact that the Dorsett titles were being discussed shows that they were thought by both parties at that time to be included. There was no reason for any election on the part of McKim, for under Whelan's contention he had nothing to do with the Dorsett titles. Whelan was disparaging, according to the evidence, the Dorsett titles, although within a month he was accepting contingent employment thereon, and spent his time from August 16, 1920, up to February 15, 1921, in working on these titles, which, according to his evidence, McKim and he agreed were "no good."

The important conversation of January, 1920, in Whelan's office cannot be divorced from all that preceded it. It must be considered in connection with what had theretofore taken place, and also with what followed. The mere fact that both Whelan and McKim may have concluded to go on with the Shannon titles, or that McKim paid for the Shannon abstract, does not show an abandonment of McKim's interest in the enterprise with relation to the Dorsett titles. From McKim's testimony as to this meeting we quote: "I asked Mr. Whelan if these two Dorsetts, minority locators in the large association of eight of more, had failed to convey, how we were going to make anything out of that? Mr. Whelan said that it was his opinion, offhand, that it would be necessary for the Dorsetts to come in under what was called the inuring clause of the leasing bill. Then Mr. Whelan said that so far as the southwest quarter of 18 was concerned, there would be a case in which all the locators were affected by any defects in the title or conveyance, and therefore he thought that would be the thing to turn our attention to first, as the most obvious—something we could see, some way, to do something with—and I stated that I thought at any rate the Dorsetts should be approached and contracts made with them." We think the evidence fails to show any abandonment of the Dorsett interests on the part of McKim, or any separation of them from the Shannon interests.

Whelan testifies that in the conversation in January, 1920, heretofore referred to, McKim agreed to finance the operations as to the Shannon title. Whelan is corroborated in this by Boeke. Of course, if McKim did agree to finance the Shannon matter it affords basis for the conversation testified to by Whelan, Plummer, and Boeke on May 30, 1920, in which McKim is alleged to have counted himself out of the Shannon matter. It is hard to understand why McKim should have paid the expense of the joint venture as to the Shannon title. It is difficult also to accept such statement as true, in view of the evidence of Mr. Whelan as to his knowledge of McKim's poverty. When the question was suggested of employing investigators to find Mrs. Shannon, defendant Whelan emphasized the fact of his and of McKim's poverty. Further, if McKim had agreed, as testified by Whelan, to finance the Shannon operations, it is difficult to understand why Whelan did not ask McKim for the necessary money, instead of using without authority Gates' money so to do. The record shows that he knew where McKim was. It was in April, 1920, that Whelan borrowed from Plummer Gates' money to take a trip to Florida on the Shannon title matters, and about the same time Plummer went to Oklahoma and New York on the same titles. The evidence shows that Whelan received a telegram from McKim dated April 12, 1920, in relation to Salt Creek titles, and replied by telegram on April 17th, so Whelan knew where McKim was, and yet no request was made by him of McKim at that time for money to pay the expense of the Shannon investigation. Instead of requesting the money from the man who Whelan testified had agreed to finance it, Whelan was wrongfully permitted by Plummer to use a part of the Gates' money. It would seem that if McKim had agreed to finance the Shannon matter Whelan would not have arranged, as appears from the testimony he did, to take Shaffer and Gates in and "to give an interest to some of the boys in his office associated with him," viz., Plummer and Boeke, without McKim's consent. It would be reasonable to expect that the party doing the financing would at least be consulted about the division of the profits. Further Hansen testifies, without contradiction thereof, that in March, 1920, Whelan in his presence informed McKim that Gates had been taken into the deal to finance it.

A careful reading of this evidence and consideration thereof satisfies us that McKim's statement that he did not agree to finance the Shannon title is more worthy of belief than the contention that he did so agree.

We approach the question of the "counting out" conversation of May 30, 1920, which it is interesting to note was after Plummer had secured the contracts with the Dorsett heirs. The testimony of defendants

Whelan, Plummer, and Boeke is that on May 30, 1920, McKim was informed that Gates' money had been used by Whelan and Plummer in financing the Shannon title, and that he (McKim) must immediately repay the amounts expended; that McKim objected and said, "If I have got to go ahead and finance this proposition, you can count me out." Whelan testified that he had told McKim the same thing in a prior Denver conversation. It does not appear that any explanation was given McKim as to how or why the Gates money was used, nor was he informed that Gates was financing the Dorsett titles; nor did he make any inquiry according to defendants' testimony as to who Gates was or how Plummer and Whelan happened to be using his money. The testimony shows that on May 14, 1920, in one of the Denver conversations in Hansen's presence Whelan had informed McKim that he had taken Gates in on the proposition and that McKim objected because it was not decided what interest Gates was to have. We think the conversation of May 30, 1920, in which McKim was told that he must repay immediately the money that Whelan and Plummer had used out of the Gates money is so extraordinary and unreasonable under all the circumstances disclosed, and so out of line with the arrangement existing between Whelan and McKim at that time, that it cannot be accepted any more than the evidence of McKim agreeing to finance the Shannon title. Both of these pieces of evidence fall together. Not only is the conversation as to McKim counting himself out improbable, but it is difficult to understand just what he was to be counted out of. Whelan testifies McKim was not in on the Dorsett matters, so of course from Whelan's standpoint he was not counted out of that. Whelan admits in his cross-examination that if he had secured anything on the Shannon titles McKim was entitled to some of it. The correspondence clearly shows that Whelan was keeping McKim advised of the progress of the Shannon title and the efforts before the Secretary of the Interior with relation thereto long after the time of the alleged counting out. So it is apparent that Whelan regarded McKim as still in the arrangement and enterprise as to the Shannon title. He could not well claim otherwise in view of the telegrams and letters passing between them as shown by this record after the time of the alleged counting out. As late as March 1, 1920, he wrote McKim with relation thereto. The evidence is absolutely at variance with the position that

McKim was counted out on the Shannon title, and as the Shannon and Dorsett matters were part of one transaction, McKim was still in the arrangement with Whelan as to Salt Creek matters at the time Whelan accepted employment on the Dorsett titles from Plummer in February, 1920. It is apparent that McKim regarded himself at all times as having an interest in the Dorsett titles. At the commencement of the conversation in January, 1920, at Whelan's office, so frequently referred to, McKim asked Whelan as to there being "anything available" in Salt Creek. In July, 1920, McKim asked Whelan what progress had been made towards obtaining titles in Salt Creek, and asked what had been done as to the Shannon heirs. He was told Plummer was working on the matter. He asked Boeke in October or November, 1920, as to whether any report had been received in regard to Salt Creek titles from Whelan; inquired from Whelan in April, 1921, as to what had been done to protect his interest in the Dorsett title transactions, and in April, 1921, demanded of defendants his rights therein.

The reasons for taking Shaffer in are not clear in the record, and as settlement was made in some way with Shaffer, not disclosed, the court is in the dark as to the exact reasons why Shaffer was to be given such a large percentage. Plummer testifies that it was to secure a change in rules in the Interior Department. This must have been for the benefit of the Dorsett titles, as at that time Plummer did not know, according to his testimony, of the Shannon matter. Apparently Shaffer was taken in before McKim was counted out, though Plummer testifies Shaffer was not in until McKim was out.

Whelan testifies that whatever he received out of the Dorsett matter he received as a lawyer under employment from Plummer, his office associate, and it is contended that, having nothing to do with making or following up investigations in the Salt Creek field, his employment as such lawyer was of no concern to McKim in any event and would not be included in terms of the alleged contract. It is apparent we think that he went into this enterprise as a business proposition and venture, and not as part of a lawyer's practice. It his letter to Mr. Parker of Bowling Green, Ky., in 1920, he says:

"The simple matter is that I am engaged in certain Salt Creek activities, which have required absolutely all my time, thereby

making it necessary to sacrifice my law business—which has been done.

"The Salt Creek activities will result in due course early in the fall, in a substantial interest in some very valuable leases, but one cannot borrow forever to pay his way, nor can one always rely on the good will of his creditors. Therefore, to save parting with an interest, for a small amount of money, in very valuable holdings that will mature in a very short time, I decided upon the emergency of relying upon your square dealing, in the light of your large financial success of the last several months."

He told his future wife prior to delivering to her the antenuptial agreement that his law practice was all gone. His services as a lawyer were hardly essential. There seem to have been sufficient lawyers to attend to any legal matters arising. Plummer and Boeke were lawyers, and Lindsley was later added to the legal staff. It may be that in realizing on the work of securing a settlement out of the oil companies by the assertion of what is politely termed "nuisance values" or as Whelan and Plummer stated to witness Strong with reference to the Shannon claim, that it could be used as a club "in procuring something from the government," many lawyers were needed and extended legal work necessary, yet such labors might be lightened somewhat in view of the testimony that defendant Shaffer was taken in and given thirty per cent. of the prospective profits on account of his supposed influence at that time with the Interior Department. The fact is that Whelan went into this enterprise with Plummer, Boeke, Scott, and Gates as a joint promoter and speculator, and was not engaged merely as a lawyer, rendering legal services. He was part of the enterprise. We are satisfied from the evidence that McKim and Whelan were in a partnership arrangement broad enough to cover both the Dorsett and Shannon matters; that such arrangement existed when Whelan associated himself with Plummer, Boeke, Scott and Gates; that it continued on after Shaffer and Lindsley came into the transaction and had not been terminated.

We conclude that the equities of this case warrant a holding that McKim is entitled to a one-half interest in the net proceeds already received by Whelan or that may be received by him in the future by reason of the permits and leases arising out of the so-called Dorsett titles in the Salt Creek field.

[4] This brings us to another question, viz., the antenuptial agreement. After suit was started it appeared that Whelan had conveyed his interest in the Dorsett titles by an instrument dated in August, 1920, witnessed by defendant Boeke, and not placed of record, to a lady whom he subsequently married, and who was his wife at the time of the trial. He did not include in this antenuptial agreement the Shannon title, because he says it was only a prospect, but of course it was no more a prospect than was the Dorsett title. Near the time of this assignment, which was kept secret until about the time of the trial, Whelan signed the declaration of trust of July 27, 1920, in which he stated he was the owner of the Dorsett interests. After the assignment Whelan signed the operating agreements in which he was represented to be owner of an interest in the Dorsett matters. The agreement was apparently discussed and agreed on some time prior to the marriage, and while the marriage did not take place until August, 1920, and some of the transactions in which Whelan represented himself as owner of an interest in the property occurred before that time, it is apparent that his future wife must have known that Whelan was asserting ownership of an interest in the permits on the Dorsett titles at all times, either before or after the agreement. She never asserted her alleged ownership prior to this suit. We are satisfied the antenuptial agreement was another attempt on the part of Whelan to deprive McKim of any interest in the proceeds from the Dorsett titles. The failure to record the instrument and the dealing in the property as his own, which must have been with the knowledge of his wife, are strong evidence of fraud. We do not think Whelan could defeat McKim's interest by this attempted transfer and that both the defendants Eugenia Marie Whelan and the Wyoming National Bank of Casper secured only the interest of Whelan.

[5] The opinion of the trial court, while entitled to great consideration, is not a finding of fact, and is not binding on this court. We have deemed it our duty to consider all the evidence and exhibits in this case. Such consideration has satisfied us that an injustice has been done to plaintiff's assignor, McKim, and that defendant Whelan has attempted to deprive plaintiff's assignor of his just part of an enterprise which both entered into in apparent good faith. We think the conclusion of the trial court as to the rights of McKim and Whelan is against the

weight of the evidence, and we feel compelled to reverse the case as to defendant Whelan, and to remand it for an accounting as between plaintiff and Whelan. We hold that McKim was entitled to an undivided one-half of the net proceeds accruing to Whelan out of the permits or leases based upon the Dorsett titles, and there is no question that plaintiff by assignment is owner of McKim's claim. The court in an order appearing in the record had before the decision of the case accepted as the proper interests of the respective parties the figures of the declaration of trust filed in the office of the Secretary of the Interior. Under this, defendant Whelan has a twelve per cent. interest. Our holding would therefore give to plaintiff a one-half of Whelan's 12 per cent. interest in the project, or a 6 per cent. interest.

The trial court was not called upon to pass on the question of any rights of the Wyoming National Bank of Casper, or of Mrs. Whelan, to any part of the fund derived from the leases. We conclude the antenuptial agreement can operate only to convey to Mrs. Whelan and the bank the interest of defendant Whelan as here found and does not affect the interest of McKim. We consider it a fraud on his rights.

[6] Question is raised as to costs. The entire cost of the case should not be taxed to plaintiff, but an equitable apportionment should be made between plaintiff and defendant Whelan. That is a matter for the discretion of the trial court which may possibly not be exercised until after the accounting takes place. The costs of this appeal are taxed, one-half to plaintiff and one-half to defendant Whelan.

The judgment and decree is affirmed as to defendants Plummer, Boeke, Scott and Gates, and as to defendant Whelan is reversed and remanded.