## PUGET SOUND TUG & BARGE CO. et al. v. WATERMAN S. S. CORP.

## SHIPOWNERS & MERCHANTS TOWBOAT CO., Ltd. v. WATERMAN S. S. CORP.

### THE SEA FOX.

Nos. 25538, 25539.

United States District Court
N. D. California, S. D.

June 5, 1951.

Joseph B. McKeon and McKeon & Colby, all of San Francisco, Cal., proctors for libelants.

Clarence G. Morse, Francis Tetreault, and Graham & Morse, all of San Francisco, Cal., proctors for respondent.

ROCHE, Chief Judge.

By these two actions, which were consolidated for trial, the libelants seek to recover an award for the alleged salvage of respondent's vessel, the S. S. Herald of the Morning, by the tugs Sea Fox, Neptune and Hercules.

The litigation grows out of the following facts, as disclosed by the record.

At all pertinent times the respondent Waterman Steamship Corporation (hereinafter called "Waterman") was the owner of the American steamer Herald of the Morning (hereinafter called "Herald") which it had purchased from the United States Maritime Commission for reconversion to a cargo vessel. Subsequent to the contract of purchase, the Maritime Commission on behalf of Waterman entered into a contract for the reconversion of the Herald with Pacific Car & Foundry Company doing business as Everett Pacific Shipbuilding and Drydock Company (hereinafter called "Everett-Pacific"), under the terms of which Everett-Pacific agreed to have the vessel transferred from Oakland, California, to its yards at Everett, Washington. Pursuant to this contract provision Everett-Pacific entered into a towage agreement with libelant Shipowners & Merchants Towboat Co., Ltd. (hereinafter called "Shipowners") as the chartered owner and operator of the Tug Sea Fox. The Sea Fox is a diesel tug with a length of 126 feet overall, a beam of 28 feet, a depth of 14½ feet and a rated horsepower of 1200. The Herald is a C–2 type vessel of 6,214 gross tons, 3508 net tons and 8663 deadweight tons, 435 feet overall length, 63 feet beam and 40 feet 6 inches molded depth. At all pertinent times said vessel was a dead ship without power of propulsion, with a draft of 8 feet 11 inches forward and 17 feet 3 inches aft.

The towage contract released Shipowners from liability for loss or damage arising from faults or errors in the navigation or management of the tug or tow and it further provided that Shipowners should be named as an additional assured in Everett-Pacific's insurance policy covering the tow. If this was not done, Everett-

Pacific agreed to assume the risk, including any liability of Shipowners which could be covered by insurance. It does not appear from the record that Shipowners was so named.

The Herald was covered by a policy of insurance which included salvage among other risks and in which Waterman and Everett-Pacific were the named assureds. The policy recited the towing tug's release from liability and the consequent charge of a higher premium rate, which was paid. Another provision required that the vessel, tug and all towing arrangements be approved by the United States Salvage Association. Such approval was given with the proviso that during the trip advantage should be taken of favorable weather to the extent possible.

The Herald, carrying a crew of sixteen men, left San Francisco Bay in tow of the Sea Fox on November 5, 1948. She was without cargo, without power to handle any of her gear, and had only her port anchor available for use, the starboard anchor chain having been shackled to the steel towing hawser. This tow wire parted on November 7th and on the following day the Sea Fox succeeded in passing its spare full length tow wire to the Herald. This, however, fouled on the winch drum of the tug's towing engine and had to be cut off and dropped into the sea. The fair lead traveler also had to be removed from the winch because of damage. Shipowners was advised of the situation and sent a second tug, the Sea Prince, which took the Herald in tow. The three vessels put into Drake's Bay where the Sea Prince passed its tow wire to the Sea Fox and on November 9th the tug with the Herald in tow again headed northward.

There was no further mishap until November 13th, although the log of the Sea Fox records some squally weather and the fact that the tow was shearing badly. In this connection it must be remembered that the Herald was a large unloaded ship, riding high in the water, and presenting a perfect target for the wind. During the night of the 13th and on the 14th the tug and tow encountered increasingly heavy weather; the towing board that had been placed on the tug's stern to keep the tow wire from chafing went overboard; the towing engine's gears carried away and emergency measures had to be used to halt the winch drum and thus prevent the tow wire from paying out. A strong wind and heavy seas increased the strain on the line and late on the 14th the Sea Fox radioed for assistance, then headed out to sea to ride out the storm.

The cutter Balsam from the Astoria Coast Guard station reached the scene about eight o'clock that night and the tug Neptune, which was proceeding up the coast to Seattle, arrived the following evening. The Neptune made several unsuccessful attempts to put a line aboard the Herald from the lee side, finally desisting because of the danger that the ship would drift down on her. The storm had increased to a whole gale and early in the morning of November 16th the tow wire between the Sea Fox and the Herald parted, carrying with it the preventer wire which had been attached sometime before in an effort to ease the strain on the towing machine. With no motive power of her own the Herald soon lay broadside to the wind and began to drift in a northeasterly direction toward the shore about forty miles distant.

After daybreak the Neptune again approached the Herald from the lee side but was unable to get in close enough without danger of being run down. She then approached the drifting ship's bow from the windward side and after considerable maneuvering succeeded in picking up a light line attached to life rings thrown from the Herald but the vessel's crew, which had to pull the line in by hand, was unable to lift the steel pendant to which the tow wire was attached over the lip of the ship's chock. The crew continued their efforts for about an hour, during which time the Neptune maneuvered as close as she dared in order to lessen the weight and drag of the steel pendant and hawser. Suddenly a great sea struck the Neptune when her bow was about 75 feet distant from the bow of the Herald and drove her right at the Herald's stem. At the same time the force of the same sea

lifted the Herald and when she came down her stem knifed through the starboard side of the Neptune, inflicting a mortal wound. It soon became evident that she could not be saved and orders were given to abandon ship. One of her officers fell overboard and died, apparently from a heart attack. The Balsam took the remaining officers and men on board, then followed the drifting Herald after instructing the tug Sea Fox to stand by the Neptune. The Sea Fox remained with the sinking tug until she went down some five hours later, then proceeded as fast as she could for the Herald. In the meantime the Balsam had got her ten inch manila hawser on the Herald but it soon parted in the storm and the ship continued to drift in toward shore, which it was estimated she would strike about midnight.

By the time the Sea Fox reached the Herald she had come into shoal water and the Balsam radioed the tug to instruct the Herald to drop anchor, At first the Herald failed to let out enough chain. The Sea Fox then instructed her to let out about 9 shots and after this had been done, the anchor apparently held. It was now dark and the attempt of the Sea Fox to shoot a line to the Herald with a Lyle gun failed, the crew evidently missing it in the darkness.

By early morning of the 17th, when the Coast Guard Cutter Winona arrived on the scene, the weather had moderated.

At the suggestion of the Sea Fox, the Winona passed one end of her 12 inch manila hawser to the Herald and the other end to the Sea Fox and the tug then moved out ahead of the anchored ship and kept her engines going ahead in order to ease the strain on the Herald's anchor chain and gear. The Balsam now left the scene to take the Neptune's crew to Astoria, Oregon, but later returned. The Winona remained until after the Tug Hercules, which had been summoned from Seattle, arrived early on the morning of November 18th.

The Hercules passed her tow wire to the Herald. Both tugs were soon in difficulty because in their effort to keep far enough apart to avoid collision they broached broadside to the wind and were carried toward the Herald's stern. During this time the Herald's crew endeavored, unsuccessfully, to slip her anchor and finally had to cut the anchor chain with an acetylene torch borrowed from the Balsam. The Sea Fox and the Hercules succeeded in forging ahead of the Herald and commenced towing her, accompanied by the Balsam. They reached Everett, their destination, on the evening of November 19th and the Hercules then returned to Seattle, arriving about one o'clock on the morning of the 20th.

The first question for decision is whether the foregoing facts show a case of salvage. If they do, the court must then fix the award and determine the extent to which each vessel is entitled to participate, if at all.

To constitute salvage of a vessel she must be in impending peril of the sea from which she is rescued by the voluntary efforts of others. Whether the Herald was in such peril after her tow wire parted shortly after midnight on November 16th is a question of fact and the court believes that the evidence shows conclusively that she was. Respondent Waterman attempts to minimize the danger by stressing the fact that the ship was able to anchor in shoal water and that her anchor held. The record discloses, however, that during the period when the Herald was being held only by her anchor the weather had moderated and was relatively calm. By the time the wind and seas began to increase in force the Sea Fox had a line on the Herald and by keeping her engines going ahead she materially eased the strain on the Herald's anchor chain. Furthermore, another heavy storm blew up on the night of the 18th, and there is credible testimony that the vessel's single anchor probably would not have been sufficient to keep her from being blown ashore where she would have become a total loss. It was only through the efforts of the Sea Fox and the Hercules, assisted by the two Coast Guard cutters, that the Herald was rescued from her position of peril and towed safely to her destination.

■ The Court concludes, therefore, that the Herald was salvaged and it remains to fix the award and each vessel's proportionate share. "Salvage" is compensation which includes the element of reward for voluntarily performing a meritorious service. It has long been favored by public policy as important to the safety of lives and property at sea. In fixing the amount of the award the court must consider not only the value of the property saved and the degree of danger from which it was rescued but also the value of the salvors' property used in the operation, the risk to which it was exposed, the labor expended by the salvors and the risk incurred by them, and the promptitude, skill and energy displayed in rendering the service.

■ The record discloses that the Herald had a fair market value somewhere between $1,054,000, the sum for which she was insured for the voyage, and $375,000 which, it was testified, was the very minimum value that could be placed on her. The three tugs had a combined value of $400,000. Their respective values, as stipulated, were: Neptune—$150,000; Sea Fox—$125,000; Hercules—$125,000. The service was performed under hazardous conditions. Not only was one tug lost but there is evidence that the men on the Sea Fox were frequently in danger of being swept overboard by the heavy seas. That the service was rendered with promptness, skill and energy is apparent from the facts heretofore recited. In view of all the evidence, therefore, the court estimates that the total salvage should be considered at the sum of $60,000, provided all the salvors who rendered service claimed and were entitled to claim pay for their services. The Coast Guard Cutters Winona and Balsam, however, have not claimed, nor are they entitled under the law to claim any pay for their share in the operation. These two Government vessels rendered a substantial contribution which the Court fixes at one-fourth of the salvage service and which must be taken into account in fixing the salvage award. United States v. Central Wharf Towboard Co., 1 Cir., 8 F.2d 250. Therefore the Court fixes the total salvage award at the sum of $45,000, to be divided among the participating tugs in the proportion indicated in the discussion of their respective claims.

### Sea Fox

Respondent Waterman resists the claim of the Sea Fox on grounds that may be summarized as (1) the Sea Fox did only what she was bound to do under her towage contract, and (2) any position of danger in which the Herald was placed resulted from the fault of Shipowners and the tug.

■ Whether a towage contract should be held superseded by the right to salvage depends upon all the facts and circumstances of the particular case viewed in the light of the applicable principles of law. The classic statement of these principles is found in The Minnehaha, Lush. 335, 15 Eng.Rep. 444, 451, still the leading case on the subject, in which the Privy Council held: "She (the towing vessel) may be prevented from fulfilling her contract by vis major, by accidents which were not contemplated and which may render the fulfilment of her contract impossible; and in such case, by the general rule of law, she is relieved from her obligations. But she does not become relieved from her obligations because unforeseen difficulties occur in the completion of her task; because the performance of the task is interrupted, or cannot be completed in the mode in which it was originally intended, as by the breaking of the ship's hawser. But if in the discharge of this task, by sudden violence of wind or waves, or other accidents, the ship in tow is placed in danger, and the towing-vessel incurs risks and performs duties which were not within the scope of her original engagement, she is entitled to additional remuneration for additional services if the ship be saved, and may claim as a salvor, instead of being restricted to the sum stipulated to be paid for mere towage."

■ In the instant case the salvage claim is not based on the mere breaking of

the tow wire. It is based on the efforts of the Sea Fox in pursuing and ultimately rescuing, with assistance, the Herald after the ship had been set adrift by the storm and blown into a position of danger. Respondent argues that strong winds and heavy seas are apt to be encountered along the North Pacific coast in the month of November and that, therefore, they must have been in contemplation of the parties to the towage contract. If this argument were sustained it would mean that a tug would be held strictly to its contract no matter how extraordinary and hazardous its efforts to save its tow imperilled by the violence of wind or waves. The Court does not believe that such a holding would be consonant with maritime policy or with the legal principles set forth above. Accordingly, the Court holds that the facts in this case warrant allowing the Sea Fox to claim as a salvor. The only remaining question is whether her claim is barred because of fault or negligence.

Respondent Waterman alleges that the Sea Fox was negligent in that her towing equipment was defective; she was carelessly navigated and manned by officers inatentive to their duties; she failed to put into a port of refuge, specifically the Columbia River, after receiving storm warnings; she should not have left Drake's Bay without a full length "insurance" tow wire on board; and she was guilty of statutory fault in that Captain Sommer, her master, did not have an unlimited master's license.

These allegations, save that of statutory fault, involve questions of fact and the court does not find them supported by the record. There is no doubt that the Sea Fox did receive storm warnings but there is no testimony that any "port of refuge" was available. On the other hand, four experienced tug masters testified that the weather conditions from November 13th through the 16th were such that it would not have been feasible for the tug to try to take the Herald across the Columbia River Bar. Under all the circumstances it was but good seamanship for the Sea Fox to head out to sea to try to ride out the storm. Nor does the record disclose in what way having an extra full length tow wire on board would have enabled the Sea Fox to do anything she did not do, since the storm that caused the tow wire to part also made it impossible to get any line aboard the Herald.

The allegation of statutory fault involves the question of burden of proof. Respondent Waterman asserts that under the so-called "Pennsylvania Rule" the burden is on the Sea Fox to prove that Captain Sommer's lack of an unlimited master's license not only did not, but could not have contributed to placing the Herald in danger. This rule stems from The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, a collision case in which the Supreme Court stated that the navigation rule violated by one of the vessels was one intended to prevent collisions and hence it was no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. The Court then went on to hold that in such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Since this decision the rule has been applied in a number of cases in which there was an apparent causal connection between the statutory violation and the disaster. See, for example, The Denali, 112 F.2d 952, a 1941 decision of the Court of Appeals for the Ninth Circuit, where the statutory three-watch provision for mates was being violated at the time errors in navigation caused the vessel to be stranded. The Court held that the rule and presumption of the Pennsylvania case controls in libels for injury to sailors or cargo where the vessel has violated the positive command of a safety statute to prevent fatigue in the navigating officer controlling her navigation at the time the navigation caused the injury, whether by colliding with another vessel or with a reef on which she strands. Similar cases are Belden v. Chase, 150 U. S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (vessel which sank as the result of a collision had

violated certain statutory passing rules); The Material Service, 1937 A.M.C. 925 (vessel sank after being rendered unseaworthy by the cutting of holes in the hatch covers in violation of certain rules and regulations having the force of statutes); The Eagle Wing, D.C., 135 F. 826 (collision, the vessel at fault being navigated by an unlicensed mate); Martin Marine Transportation Co. v. U. S., 4 Cir., 183 F. 2d 676 (collision involving barges not carrying a full complement in crews, in violation of certain statutes). The Court has found no application of the rule to a factual situation like the one here presented. Furthermore, the record discloses that the Sea Fox was officered by Capt. Reichel and Mate Harris as well as Capt. Sommer. Capt. Reichel had an unlimited master's ocean going license and Mr. Harris, the second mate, had an unlimited chief mate's ocean going license. All three were experienced and competent men.

 Assuming, however, that in this case the rule is applicable, the burden of proof has been carried because the evidence clearly shows that the Herald was set adrift and carried into a position of danger solely by the violence of the storm.

The Court concludes, therefore, that the Sea Fox was free from fault or negligence and is entitled to share in the salvage award to the exent of fifty-five percent, or the sum of $24,750.00.

### Neptune

Respondent Waterman contends that not only did the Neptune give no actual assistance to the Herald but that she was lost through her own negligence in approaching the ship from the windward side. The record discloses, however, that she attempted repeatedly to come in from the lee side, attempts that were made extremely hazardous by the danger of the Herald drifting down on her. Her windward approach was a last resort in her effort to help the drifting vessel. That it ended disastrously was not due to negligence on her part. It resulted from her persistence in attempting to aid the Herald's crew in their effort to haul on board the tug's tow wire which she had succeeded in attaching to a messenger line from the ship. Their effort was unsuccessful but through no fault of the Neptune.

 Ordinarily a vessel can share in a salvage award only if she has contributed to the successful salvage operation. Where, as here, however, a vessel that does so contribute and the vessel whose attempted contribution has failed belong to the same owner there is, in effect, a joint salvage operation and both are entitled to participate in the award. The Flottbek, 9 Cir., 118 F. 954; Atlantic Transport Co. v. U. S., 42 F.2d 583, 70 Ct. Cl. 33. Here libelant Puget Sound Tug & Barge Company was the owner of the Neptune and chartered owner of the Hercules. While the monetary loss of the Neptune is not an allowable item as such in computing the amount of the award, her loss does make certain the existence of the danger to which she was subjected and the item of recovery due to peril may be approximately measured by it. The Alabama, D. C., 280 F. 738.

In view of the foregoing the Court determines that an allowance to the Neptune interests of twenty-two and one-half per cent of the award, or $10,125, would be proper.

### Hercules

The Hercules was dispatched to the aid of the Herald from Seattle, arriving in the early morning of November 18th. She got her tow wire to the ship while it was at anchor and she and the Sea Fox towed the vessel to Everett. While she did not encounter as great danger as did the Sea Fox and the Neptune, nevertheless there were heavy seas and strong winds on the 18th and she was subjected to considerable hazard. Her efforts were voluntary and materially aided the rescue of the Herald. Under these circumstances the Court feels that she should share in the award to the extent of twenty-two and one-half per cent, or $10,125.

There remains for disposition respondent Waterman's cross-libel against Shipowners in case No. 25,539. This proceeds on the ground that because of its alleged negligence, Shipowners is ultimately liable to Waterman for all salvage claims and for damage sustained by the Herald. The Court's finding of no negligence disposes of the cross-libel and it will be dismissed. However, even if the Court had found otherwise the cross-libel would be dismissed since the record discloses that the towage contract between Shipowners and Everett-Pacific released the tug from liability and that with knowledge of this provision Waterman procured insurance likewise releasing the tug from liability and paid therefor the higher premium rate.

In view of the foregoing it is, therefore, by the Court ordered that there be entered herein, upon findings of fact and conclusions of law, a decree in favor of libelants for an aggregate salvage award in the sum of $45,000, said award to be divided as follows: $20,250 to Puget Sound Tug & Barge Company and Cary-Davis Tug & Barge Company on their own behalf and on behalf of the masters, officers and crew of the Tugs Neptune and Hercules, of which $2,532 is fixed as the proportion due the master, officers and crew of the Tug Neptune and of which $2,532 is fixed as the proportion due the master, officers and crew of the Tug Hercules to be divided between them in proportion to their wages at the time of the rendition of the salvage service; and $24,750 to Shipowners & Merchants Towboat Co., Ltd. and Tug Sea Fox, Inc., on their own behalf and on behalf of the master, officers and crew of the Tug Sea Fox, of which $6,188 is fixed as the proportion due the master, officers and crew of the said Tug Sea Fox to be divided between them in proportion to their wages at the time of the salvage service.

Further ordered that the cross-libel heretofore filed in case No. 25,539 be and the same hereby is Dismissed.

Further ordered that the libelants recover their costs.