# The New Orleans.[1]

## Oteri v. The New Orleans.[1]

### (*Circuit Court, E. D. Louisiana.* February 25, 1885.)

**1. SALVAGE SERVICE.**
　When a vessel at sea answers signals of distress from a steam-ship whose machinery has been disabled, and goes to her assistance, and supplies provisions, and takes an officer of the steam-ship, by request, to a place where he can summon assistance for the steam-ship, such services are salvage services.

**2. SAME—DISTRIBUTION OF AWARD.**
　Where valuable services were rendered by the ship and her machinery, the master and crew doing only their ordinary duty, for which they were paid by the owners, on principles of salvage the men must receive a share of the reward. No amount of reward to owners and machinery will so stimulate and encourage efforts to save life and property in peril on the high seas, as will moderate rewards to masters and crews who are on hand to control the ship and machinery, and are the effective agents to set the machinery in motion.

**3. SAME—SALVING SHIP UNDER CHARTER.**
　In this case, where a salvage award has been made to the owners of a ship and her crew, and where it was shown that at the time the salvage services were rendered the salving ship was under charter and in possession of the charterer, the court first allowed to the charterers, out of the salvage award, their actual outlay in rendering the services,—that is, for the hire of the ship, and for the pay-roll, and fuel consumed during the delay,—and divided the balance of the award equally between the charterer, the owner of the ship, and the crew. *The Alfen*, Swab. 189, and *The Waterloo*, 2 Dod. 433, distinguished.

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

4. Costs.
   Where claimants have made no tender, paid no money into court, brought in no parties, and have done nothing to facilitate the cause save to admit a contract made with a salving vessel, the costs should be borne by them.

Admiralty Appeal.

*W. S. Benedict,* for libelants, appellants.

*E. W. Huntington* and *Horace L. Dufour,* for claimants, appellees.

*Richard De Gray,* for owners of the Raleigh.

PARDEE, J.   The facts appear to be substantially as follows:

On the ninth of May, 1884, while the steam-ship New Orleans was in the Gulf of Mexico, on a voyage from New York to New Orleans, at a point about 125 miles south-east from the South Pass of the Mississippi river, her cylinder exploded, killing one of her engineers, injuring others of her crew, and rendering her motive power useless.   Thereupon signals of distress for assistance were given from the New Orleans, which were first discovered from the bark Ophir, then on a voyage from Aspinwall to Pascagoula, about 12 o'clock on the night of May 9th, and in obedience thereto said bark tacked and beat towards said signal,—which was a flash-light,—and at daybreak the New Orleans was discovered with her signal of distress flying.   As the Ophir approached, the master of the New Orleans put off from her in a ship's boat, in company with his first officer and a boat's crew, and came on board of the Ophir, reported the above accident to the New Orleans, asked for provisions, and that the Ophir would convey his first officer to the mouth of the Mississippi river, or to some steam-vessel going to the mouth of the Mississippi river, to summon assistance to the New Orleans.

Provisions were furnished by the master of the Ophir to the New Orleans to the value of $60, and the Ophir cleared away for the mouth of the Mississippi in the forenoon of that day, with the first officer of the New Orleans on board.   The wind at the time was light, and while thus proceeding, on the following morning, a steam-ship hove in sight, and then signals of distress were made on the Ophir to attract the steamer's attention, in obedience to which the steamer, which proved to be the Raleigh, bound to Honduras, came under the bark's stern and was informed of the condition of the New Orleans, and her latitude and longitude, and was requested to go to her assistance, which she did, while the bark continued her course to the South Pass until the night of the twelfth of May, when the first officer of the New Orleans was transferred to the steam pilot-boat Underwriter, bound to South Pass, and the Ophir proceeded on her way to Pascagoula.

In obedience to the above information and request, the Raleigh changed her course and ran to the point indicated, where she arrived in the course of four hours, and was boarded by the master from the New Orleans, who requested the master of the Raleigh to tow him to South Pass, but as they could not agree on terms, the Raleigh, after supplying the New Orleans with more provisions, proceeded on her voyage.   When the Raleigh had arrived at a point about 10 miles distant from the New Orleans, she was again signaled from the New Orleans to go back to her, which she did.   Then a contract was signed by the master of the Raleigh, on behalf of *her owners* and the master of the New Orleans, for the towing of the latter by the former, using the latter's hawser, to safe anchorage at South Pass bar, for the sum of $5,000, which was safely done; and the Raleigh, after coming inside the Pass and receiving coal, again went to sea and proceeded on her voyage to Belize, Honduras.

The services so rendered by the Ophir and the Raleigh to the New Orleans were salvage services.   See *The Hædwig,* 24 Eng. Law & Eq. 582; *The Susan,* 1 Spr. 499; *The James T. Abbott,* 2 Spr. 101; *The*

*Williams*, Brown, Adm. 208; *The Bolivar*, 1 Woods, 397; *The Sarah*, 3 Prob. Div. 39; *The Saragossa*, 1 Ben. 553; *The Charles Adolphe* Swab. 153; *The Reward*, 1 W. Rob. 174.

The amount to be allowed for these salvage services, if presented as a new question to the court, might require an examination into the value of the property salved, and a consideration of the circumstances under which the services were rendered; but the parties have practically settled the matter themselves. The main service was that of the Raleigh, and as to that the respective masters agreed and contracted before the services were rendered, and the amount of $5,000, so fixed, is not attacked by either party as too much or too little, or as oppressive or inequitable.

The master of the Ophir, before suit, offered to settle for $250. The service of the Ophir was incidental, and should be fixed with reference to the main amount allowed. In view of the litigation and the intervention of the crew, $500 seems the proper compensation.

Having determined that the services were salvage services, and the amount to be awarded therefor, the next question is one of distribution. As to the sum awarded the Ophir there is no trouble,—one-half should go to the owners, and the other half to the master and crew, according to the pay-roll. The distribution of the sum awarded the Raleigh presents more difficulty. The valuable services were rendered by the ship and her machinery, the master and crew doing only their ordinary duty, for which they were paid by the owners, and yet on principles of salvage the men must receive a share of the reward. No amount of reward to owners and machinery will so stimulate and encourage efforts to save life and property in peril on the high seas as will moderate rewards to masters and crews who are on hand to control the ship and machinery, and are the effective agents to set the machinery in motion.

The next question is, who is entitled to the owner's share of the Raleigh's salvage? or, in other words, who were the owners of the Raleigh at the time the services were rendered? The libelant Oteri was the charterer of the bare ship and machinery, etc., by the day, manning, equipping, and navigating her at his own expense, carrying his own cargoes,—the owner *pro hac vice*. At the same time, the owners' property was used to some extent and was risked in the rendition of services to the New Orleans. If it were a mere question of compensation for work and labor, the owners would be entitled to nothing; but I think the case is very different, so far as it is a question of reward for the use and risk of property, and encouragement for the rendition of salvage services. Why reward a temporary owner and leave out the real owner? Neither one had really anything to say as to whether the services should or not be rendered. The case is one to be settled on principle, for we have no authorities at hand, if such cases have been adjudged in the admiralty courts.

*The Alfen*, Swab. 189, and *The Waterloo*, 2 Dod. 433, are not in

point; for, while they hold in terms that charterers are not entitled to salvage earned, they refer to charterers who are not in possession of and navigating the ship,—were freighters under charter-party. See Cohen, Adm. 60–63. In this case I do not understand that the contract of charter provides, either by inclusive terms or exclusive terms, as to which party to it shall be entitled to salvage money earned by the ship during the running of the charter. It seem to me that the proper rule in a case like the present is to first allow to the charterers out of the salvage award their actual outlay in rendering the services,—that is, for the hire of the ship, and for the pay-roll, and fuel consumed during the delay,—and then to divide the balance as a reward; and such rule will be followed in this case, so that from the $5,000 awarded the Raleigh the libelant Oteri shall first be paid his actual expense in rendering the services, and the balance will be equally divided,—one-third to the charterer, one-third to the owner, and one-third to the master and crew; the last according to the pay-roll. For the purpose of distribution a reference will be ordered.

As to the costs of the case I think it clear that they should be borne by the claimants. They made no tender; they paid no money into court; they brought in no parties; they have done nothing to facilitate the cause, save to admit the contract with the Raleigh, which the court has found did not cover all the salvage service rendered; in short, they have not brought themselves within the rules applied in salvage cases in order to save themselves from costs. See Cohen, 260, 261, 288, 289; Jones, Salv. 204.

The costs of the reference in this court for apportionment among the libelants will be taxed to the owners and charterers of the Raleigh.