## THE APALACHEE. THE WABAN. THE CECELIA.

(District Court, E. D. South Carolina. May 28, 1920.)

### No. 787.

1. Salvage ⬥19—Success of one of two vessels under common management in common undertaking credited to both.

Where two steam tugs under common management were engaged in a common undertaking of salvage, the success of one of them after the other was disabled by accident is to be credited to some extent, at least, to the other.

2. Salvage ⬥30—$10,000 and damages sustained awarded for relieving vessel stranded on sand in no great danger.

Where steam tugs aided in pulling off a vessel worth $450,000 from sand, where she was stranded, but it was doubtful whether the final result was not attained by the vessel alone, and the operation involved no great danger, $10,000 may be awarded as salvage, in addition to the damages sustained by the tugs.

3. Salvage ⬥38—Apportioned between owners and crew in ratios of four-fifths and one-fifth.

A salvage award of $10,000 will be distributed, 80 per cent. to the owners of the salvaging tugs, and 20 per cent. to the crews, in the proportion of the monthly wage of each member.

In Admiralty. Libel by Robert H. Lockwood, manager of the steam tugs Waban and Cecelia, against the British tanker Apalachee, her engines, etc., for salvage. Salvage awarded libelant.

Miller, Huger, Wilbur & Miller, of Charleston, S. C. (Alfred Huger, of Charleston, S. C., of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Buist & Buist, of Charleston, S. C. (Robert S. Erskine, of New York City, of counsel), for respondent.

SMITH, District Judge. This is a proceeding in rem, brought by the libelant against the British tank steamer Apalachee. Libel was filed December 28, 1918; the vessel was duly arrested, and has been released on stipulation. The Anglo-American Oil Company, as the owner of the steamship Apalachee, has appeared as claimant, and the steamship has been released on bond.

The cause, being at issue, came on to be heard. Testimony has been taken, and the cause has been duly heard on the merits. From the testimony it appears that on the 24th of December, 1918, the British steamship Apalachee was on its way to the port of Charleston to receive bunker coal. The Apalachee is an iron tank steamship of about 4,200 tons, about 340 feet long, and with a depth of a few inches over 30 feet, and beam of about 44 feet. The value of the Apalachee was $450,000.

Off the coast of South Carolina, on the morning of December 24th, while in a fog, the vessel lost her bearings and grounded near the entrance of North Edisto Inlet at 11 a. m., on the coast near Charleston, about 2 miles from the shore. After she grounded, the captain attempted to extricate her, but found that she was unable to work, so he wirelessed to Lloyd's agent, in the city of Charleston, S. C., of his

condition, and requested that a tug or tugs be sent to his assistance. Upon receipt of this wireless, Mr. James H. Small, Lloyd's agent in Charleston, went to Capt. Robert H. Lockwood, who was the managing owner or agent of two steam tugs, called the Cecelia and the Waban, of the port of Charleston, and occupied in doing the usual business of tugs at that port. The value of each of these tugs was $65,000, and they were kept equipped, as far as tugs of that character can be, with the necessary apparatus for assisting vessels in distress off the coast and the performing of salvage services. The time of the notice was Christmas Eve, about 6 or 7 p. m., and with some hesitation, and after some discussion as to being able to go at that time and at that period of the year, the manager, Capt. Lockwood, finding that he could get no assistance from tugs at the nearest port, Savannah, started with both his tugs to where the steamship was said to be stranded, to assist her.

At the time that the steamship stranded, she was in water ballast and drew as her mean draft about 18 feet. When the captain found that his vessel was hard aground, and she could not extricate herself, he directed that the water ballast be pumped out of the ship, and succeeded, before the tugs came, in pumping out so much at least of the water ballast as would lessen his draft from 18 feet to 13½ feet, or about 14 feet. At the time the vessel stranded, the water was calm; but the wind thereafter rose, and when the Waban and Cecelia started to her assistance, it was blowing quite a stiff breeze, with an average velocity, according to the weather reports, of 14 miles an hour, with a maximum velocity of 23 miles for 5-minute periods. The direction of the wind was from the southwest. The sky was cloudy.

The vessel stranded at near high water on the 24th of December, and the tugs arrived in her vicinity in the neighborhood of 11 p. m., about 12 hours after the vessel had taken the ground. When the tugs arrived in the vicinity, after a little difficulty (as the night was dark), they located the ship, and found her lying stranded, with a considerable sea running. The ground, at that place where the vessel lay, is a sandy shore, shelving gradually towards high land; and when the Cecelia came up to the boat, according to the testimony of the captain of the Cecelia, she was lying with a depth at her stern of not exceeding 12 or 13 feet. This would appear to be borne out by the circumstance that the Cecelia touched ground several times in the sea, whilst endeavoring to put a rope to the vessel and tow her off, which she would not likely have done, had the depth at that point been as great as 18 feet. It would appear that after the captain had pumped out his water ballast, so as to lessen his draft by some 5 feet or over, the vessel had gradually drifted in nearer the shore, so that at high water she was lying aground with a depth at her stern of say about 13 to 14 feet.

The Cecelia, with some difficulty, got a hawser to the ship, and started to tow the ship towards deep water at about 11 p. m., or a little later. After towing a short time, say half an hour or three-quarters of an hour, the hawser broke. With some difficulty, the Cecelia again got a rope to the ship and started to tow and the hawser again broke. In the meantime the tug Waban had come up and approached the ship

as near as she safely could do in the sea, so as to get a rope to the ship to help assist in the towing. Whilst endeavoring to do so, the sea was such that the Waban struck heavily on the bottom, bent and drove her shoe up so high that it involved her propeller, so that the propeller would not work, and she thereupon drifted up to the steamer, where she was in a position where she would in the sea be beaten against the side of the steamship, and as the steamship was an iron ship and the Waban an iron tugboat, there was some possibility, if the thumping of the sea continued for any time, that either the ship's plates would be injured or that the Waban would have a break in her side and possibly sink.

The captain of the Waban, therefore, called to the captain of the Cecelia, on which tug the manager, Capt. Robert H. Lockwood, was, to come and assist him. The Cecelia, whose hawser had just broken a second time, went to the assistance of the Waban, got a rope aboard, and then towed the helpless Waban about a mile or so out in deep water, where she could anchor, if necessary, and wait until she could be further towed by the Cecelia. The Cecelia then went back to the steamship and put on another rope, which was secured to the steamship, and attempted to tow her, and the rope broke again, but was again made fast to the steamship.

The position of the vessel, when the Cecelia first came up to her and when she grounded, was that she was lying in a position about parallel to the line of the shore, northeast and southwest. The Cecelia at first attempted to tow the steamship from her stern, attempting, as it were, to work the stern from side to side, case it off from the place where it seemed to be aground, and pull the steamship off; but the last time, when she towed, she put her hawser onto the head of the ship, and attempted to pull her head around. This she was successful in doing, to the extent that she pulled it around, so as to bear nearly east, instead of northeast, and to head directly for deeper water, instead of heading to the shore, or alongshore.

The tide having fallen at this time so low that to make any further pulling at that time useless, the Cecelia left the boat and went to Charleston for supplies, so as to return to the stranded vessel upon the next high water; high water being the only period at which she could with any success attempt to extricate the steamship. On the way, she looked for the Waban, but, not seeing her, went on to Charleston alone, and, after staying there for a short time, she came back to the steamship.

In the meantime the Waban, after some work, had forced the shoe down sufficiently to allow the propeller to move slowly, and started to go back to Charleston slowly under her own steam. The Cecelia arrived at the place where the steamship was stranded next morning, just about high water; that is, about between 12 m. and 1 p. m.

When she arrived, the vessel was headed straight out to sea, towards deeper water, and her engines were moving under her own steam. Whether or not she was at that time extricated and floating is a matter of the most direct conflict of testimony between the manager of the Cecelia, Capt. Robert H. Lockwood, and the master of the steamship.

The master of the steamship says that, after her bow had been shifted so as to point to deep water, at high tide next morning, the morning of the 25th, Christmas Day, he got his engines to work and came off the strand; that after he was off the Cecelia came up, and they took a hawser from her, and the ' Cecelia assisted her by helping her out into deep water, but assisted her only in the sense of towage, as at that time she was floating and wholly free of the strand. The manager of the Cecelia testifies that the vessel was not yet extricated; that he heaved his hawser to the steamship, where it was made fast, and then pulled her directly in line as she was going, and with the assistance of the Cecelia she was finally extricated from the bottom.

The Cecelia pulled for a very short time on that occasion; the vessel came off of the strand, and then proceeded wholly under her own steam to Charleston Harbor, entered the harbor, and there made fast. It will be seen, therefore, that the whole question whether or not it was a successful salvage operation in any respect, so as that the salvors are entitled to remuneration, depends upon two questions:

First. Whether the Cecelia, in pulling the head or bow of the ship, so as to face eastward, or nearly so, in the early morning of the 25th of December, in any way rendered an assistance which contributed to her extrication from her position.

Second. Whether the Cecelia, shortly after noon on the 25th, by her towing, assisted the vessel, then still being aground, in being extricated from her position and being able to move out to sea under her own steam.

If these services, one or either of them, contributed to the rescue of the vessel, then to the extent of that contribution the salvage service was successful. The position of the vessel was that of a vessel stranded in the face of the Atlantic Ocean. She was stranded upon a shelving, sandy shore. The conditions of the weather were such as not to expose her at that time to any possibility of breaking up, nor was there much danger of a vessel of her size and strength being broken up by the action of the waves on a shore of the character upon which she lay. Her great danger was to be so driven up towards the beach and buried in the surrounding sand as to be either inextricably involved, or so involved as not to be capable of extrication without great labor and expense. There was no immediate danger, either to life or property, so far as the stranded vessel was concerned, except the danger that necessarily surrounds a stranded vessel, stranded in the face of the ocean.

So far as the salvors are concerned, the weather does not appear to have been very tempestuous, and there was no danger to life or property, except as involved in the chance of the tugs being injured by being thumped against the bottom by the seas. It was necessary for the tugs to approach the ship in the sea that existed, in order to obtain a line from her, or heave a line to her, to which a hawser could be attached, and then drawn in and made fast to the ship, or to the tug, as the case might be. To approach the ship near enough for this purpose, it was necessary for them to venture in such shallow water

that, with the sea running, there was danger of injury to property from the striking of the tugs upon the bottom.

The testimony of the manager on board the tug Cecelia is that that tug several times struck, although apparently not hard enough to do damage; but in the case of the Waban she certainly struck hard enough to injure her shoe and put an end to all possibility of her propeller moving, and of her having any control of herself; and then the danger she ran was that, if there was a collision between herself and the ship, she might be injured to the extent of possibly sinking. The night was dark. The operation was at night, and that is always an added danger under such circumstances. Still the danger does not seem to have been great, either to life or to property, of the salvors; but, if not great, it did result in injury to the Waban, amounting to some $1,200, and the loss from the breaking of the hawsers of the Cecelia was estimated at $1,000, or $2,200 altogether.

The case, in many respects, is not unlike the case of The Peruviana, a salvage case in which a decree of this court was filed on the 2d day of August, 1912. In that case the Peruviana, a British vessel of 4,000 tons tonnage, laden with a full cargo, went ashore on the coast of South Carolina, off the entrance of Stono Inlet, in about 16 feet of water, on or near the shoal constituting the sea breakers at the mouth of the channel entrance. She was on her way to Charleston, but at the time of the stranding was out of her proper course. The point at which she stranded was about 3 miles from the shore in a direct line. The then weather conditions were cold to an unusual severity. She signaled for assistance, and after some delay three tugs, the Protector, the Waban, and the Cecelia, went to her assistance. They pulled for about 4 hours on the first tide, and on the next tide towards high water again took hold of the ship, whose engines were started, and after some endeavor the ship was pulled off, was able to float, and moved under her own steam, but was also assisted by one of the tugs, which assisted her by towing until she arrived in the port of Charleston. The value of the Peruviana and her cargo was much less than the value of the Apalachee, as it was then agreed to be only $240,000; and the then value of the three tugs was only about $90,000, as against the present value of $130,000 for the two tugs.

The time engaged in the extrication of the vessel was in a rough way the same, and the circumstances very similar, except that admittedly the vessel in that case could not have extricated herself without the aid and assistance of the tugs; and in the present case it is a question of strong dispute whether or not the vessel did not actually extricate herself, without the aid and assistance of the Cecelia. If, however, the vessel had already extricated herself when the Cecelia arrived, about noon on the 25th, it does not seem probable that the master of the steamship would have allowed the tug to put her hawser aboard and assist in pulling her. If he was already afloat, moving out to sea under his own steam, there was no necessity for himself incurring the obligation of a further salvage service when he was already in safety. The likelihood, therefore, is that he was not entirely free when the

Cecelia came, and he took her hawser aboard and allowed her to assist in towing him, as he was endeavoring with the steamship's own engines to extricate her; but the point is not free from doubt.

There is a difference in the cases, however, as stated before, that in one case the efforts of the salvors were admittedly successful, and the safety of the ship was entirely due to their success, while in the present case that result is involved in doubt. The work done by the Cecelia on the last occasion was quite limited. That does not take away from any meritorious service performed on the first occasion in swinging the head of the steamship off shore and towards deep water, thereby enabling the steamship to work her engines and propeller to most advantage to extricate herself. The ship was stranded and in danger; she herself called for help; the salvors at once responded, and spared no efforts they could make to extricate the ship from danger. If these efforts in any wise contributed to the successful saving of the ship, the case is one for the allowing of salvage remuneration.

[1] Inasmuch as both tugs were under the same management, the same control, and went for a joint operation to effect the same result, they must be looked upon as conducting one salvage operation; and the success of the Cecelia must be to a certain extent at least credited to the Waban. The amount allowed for the total salvage in the case of the Peruviana was $9,000 among the three tugs, with an additional amount of $400, allowed to the person who procured the assistance for the vessel, making $9,400 in all. At the same time, the prices of all supplies and the cost of labor and the expenses of operation are much enhanced between the date of the salvage of the Peruviana and the date of the performance of the salvage in this case.

[2] The great difference between this case and that of the Peruviana is that the Peruviana was more hopelessly aground, took more effort to extricate her, and admittedly owed her extrication to the labors of the salvors; while here the final extrication by the assistance of the tug is disputed, and at any rate involved very little effort on the part of the tug, as assistant only to the work done by the ship herself. After a careful consideration of the whole case, the court is of the opinion that it is a case which calls for the allowance of salvage services, and that an allowance to the two tugs of $2,400, to cover the damages inflicted, and of $10,000, to cover the compensation to be paid for the strictly salvage services, or $12,400 in all, would be a fair and sufficient allowance for salvage; and it is so decreed.

As the two tugs appear to have been acting under a common management and for a common purpose, and ask only for a joint allowance, the apportionment of this salvage among them and their separate crews will not now be decreed, unless the two tugs are unable to apportion it among themselves, in which case the court will apportion it.

[3] With regard to the proportion of the salvage of $10,000 allowed to be paid to the crews, under the principle adjudicated in Conekin v. Lockwood (D. C.) 231 Fed. 541, and Rivers v. Lockwood (D. C.) 239 Fed. 380, it will be distributed 80 per cent., or four-fifths of the

salvage, to the owners of the tugs, and 20 per cent., or one-fifth to the crews of the two tugs, in the proportion of the monthly wage of each member of the crew.

·The costs are to be paid by the defendant.