## THE ELKRIDGE.

### THE BALTO.

District Court, S. D. New York. December 12, 1927.

1. Salvage ⬅26—In fixing salvage award, entire situation, including accidental loss of life, must be considered, though deceased were careless of their own safety.

In fixing salvage award, the entire situation must be judged, with all its attendant circumstances, including the accidental loss of life involved therein, and it is as erroneous to say that loss of life is to be compensated, as in an action for negligence causing death, as it is to say that there can be no consideration given thereto, because deceased were careless of their own safety.

2. Salvage ⬅26—Values of vessels involved, danger, skill, labor, promptitude and success of service, loss of time, and out of pocket expense must be considered in fixing salvage award.

The elements to be considered in fixing salvage award are the value of the ship which was saved and the nature of the dangers from which ship and her crew were rescued, the value of the salving vessel and the dangers which she and her crew incurred in performing the service, the skill, promptitude, and success with which the service was performed, the additional labor imposed on members of the crew of salving vessel, and her loss of time and out of pocket expense.

3. Salvage ⬅26—Too much emphasis should not be placed on percentage of salved value to be awarded, as compared with value of property saved.

In fixing salvage award, too much emphasis should not be placed on the percentage of salved value to be awarded because of the

length of towage service rendered, as compared with value of property saved; but service rendered must be fairly compensated, even if the owners who have recovered their property find payment burdensome.

**4. Salvage ☞26—That salving vessel had been operating at loss does not deprive her of right to reasonable value of salvage service.**

If salving vessel was engaged in a very profitable service, and had actually suffered a loss of profit in performing salvage service, this would be an element to be considered in fixing salvage award; but fact that salving vessel had on prior voyages incurred a loss does not deprive her of the right to recover the reasonable value of the salvage service rendered, including actual out of pocket expense, but general administrative expense and insurance costs should not be included in out of pocket expense, because they cannot be said to have resulted from salvage service.

**5. Salvage ☞34, 37—Vessel worth $240,000 held entitled to $25,000 and expense for towing vessel worth $198,000 for 2,240 miles, apportioned as stated.**

Where salvage value of steel cargo steamship, which requested towage service because of loss of propeller, was $198,400, and value of steamship which towed her 2,240 miles to port in salvage operation, taking 14 days, was $240,000, *held*, that salvage award will be fixed at $25,000, plus $8,372.64 as out of pocket expense, of which $1,000 shall be apportioned to personal representatives of two seamen, whose lives were lost in the salvage service, and $4,000 to other members of the crew.

In Admiralty. Libel by the United States, as owner and on behalf of the master and crew of the steamship Elkridge, against the Norwegian steamer Balto in a salvage cause. Decree for the United States.

Charles H. Tuttle, U. S. Atty., of New York City (Charles E. Wythe, of New York City, and Jerry C. Massey, of Washington, D. C., of counsel), for United States.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for respondent.

THACHER, District Judge. The Elkridge is a steel cargo steamer of 7,001 gross tons, 410 feet 3½ inches long, 54 feet beam, equipped with a triple expansion 2,500 standard H. P. engine and three Scotch boilers. She is an oil burner, was built in 1919, and in February, 1924, was engaged in the Pacific service between the United States and the Orient. She carried a crew of 34 officers and men. Her value was $240,000. The Balto is a steel cargo steamer of 5,873 gross tons, 457 feet long, 57½ feet beam, and equipped with turbine engine and three Scotch boilers. She is a coal burner, was built in 1913, and is a Norwegian vessel. In February, 1924, she was engaged in trade between the United States and the Orient. She carried a crew of 45 officers and men and one consular passenger. Her salved value, including bunkers, was $198,400.

On February 7, 1924, the Balto, in ballast, on a voyage from Muroran, Japan, to Seattle, at latitude 45.29° N., longitude 169.122° E., broke her shaft at the outer end of the stern tube and thus lost her propeller. She had experienced severe storms, but the weather had moderated when the accident happened. Her position was less than 75 miles south of the Great Circle between Yokohama and Puget Sound or Columbia river ports. Whether she was in the lane of travel or not may be disputed, but there is no doubt that she was within wireless range of this lane of travel for 600 or 700 miles. She was, however, a long way from port, more than 2,600 miles from Portland, over 2,200 miles from Honolulu, and at least 1,800 miles from the nearest Japanese port. It was quite impossible to repair her broken shaft at sea. Although facing no immediate danger when the accident happened, because the weather was fair at that time, the prevalence of storms at that season of the year in the northern latitudes of the Pacific unquestionably placed the ship in grave danger. Without assistance from some other vessel it is hardly to be supposed that she could have made port by improvising sails, in the manner suggested by some of the witnesses.

In this situation, she immediately communicated her distress to vessels within the range of her wireless, including an unnamed Japanese vessel, which could render no assistance because of engine trouble, an American ship, the Tri-Mountain, and the Elkridge. The latter vessels were each willing to take her in tow and to proceed to Honolulu, that course being considered much safer than a voyage through Northern latitudes to a Pacific Coast port. The Elkridge was nearer than the Tri-Mountain, and somewhat better equipped with cables for towing a large ship, and accordingly her assistance was requested. One other ship carrying passengers was several hundred miles away. Her assistance was not requested.

The Elkridge was on a voyage from Kobe, Japan, to Portland, Or. She left her course shortly after 2 p. m. on February 7th, proceeded to the position given by the Balto, and arrived there shortly after midnight. The Balto was not sighted until about 3:30 a. m., and the Elkridge was alongside about 5 a. m. During the night the men on the Elkridge were engaged in preparing lines and clamps with which to tow the Balto, and these

lines were promptly furnished to the Balto after daybreak by means of a work boat manned by the second mate and by Ericcson and Johnson, two seamen. Two lines were carried by these men to the Balto, by means of which two steel cables furnished by the Elkridge were hauled aboard and made fast to the Balto's anchor chain. The Elkridge proceeded with the Balto in tow at 8 a. m. February 8th, and brought her safely to Honolulu on February 21st at 3:30 p. m. The towing operation thus consumed 14 days and covered 2,240 miles. After remaining in port 24 hours to take on necessary supplies, the Elkridge proceeded without unnecessary delay to her original port of destination. Her actual loss of time in rendering the salvage service was 14 days.

The towing operation proceeded without difficulty until February 10th, when strong winds were encountered and high following seas. At about 11 p. m. on the 10th the Balto's anchor chain, to which the cables from the Elkridge were shackled, parted. The Elkridge thereupon stood by until morning, when, the wind having moderated, the second mate and the two seamen, who had manned the boat with him on the morning of the 8th, put out from the Elkridge in the same boat and successfully carried two lines to the Balto by means of which the cables were again taken aboard and made fast. Although there was a large swell running at the time, no great danger to the men in the small boat was apprehended, either by the men themselves or by those who remained on board the two ships. The small boat was lowered from the starboard side. When the lines had been carried to the Balto and the men in the small boat were ready to come aboard the Elkridge, she lay with her starboard side to the weather. There were no davits on the port side by which the boat could be raised to the deck of the ship. In order to bring the men aboard on the lee side, it would have been necessary to maneuver the ship so as to bring her port side to the weather. This could not be done until the towing lines were fast. The day was cold and the men in the small boat were suffering from their exposure.

Perhaps not hearing, but in any event disregarding, instructions given from the bridge, the men in the boat came around to the windward side, where an attempt was made to bring them aboard in the boat by means of the davits. The tackle from these davits was fitted with hooks, which were designed to be hooked into rings in the bow and the stern of the boat. In the bow of the boat there was a crummet, by means of which a man could prevent the ring from coming off the hook. There was no such appliance in the stern of the boat, and the only way the stern ring could be held on the hook was by hand. While the men on board were attempting to raise the boat, she was caught by a heavy swell, which lifted her stern and detached the hook from the stern ring. When the stern dropped with the wave, all three men were thrown into the water. Life buoys were thrown to them from the ship, and a boat was promptly let down from the davits on the lee side. Two of the men wore rubber boots, and none of them had life preservers. One of the seamen was picked up, but the other two, who were clinging to a single life buoy, soon went down and were lost. The man who survived suffered severely from the cold, but was quite all right a few hours after being brought on board. There was no difficulty in launching the boat on the lee side of the ship, or in taking it aboard. Except for several days of rough and stormy weather, the towing operation proceeded without further incident, and the two vessels arrived safely at Honolulu 11 days later.

While the launching and handling of an open boat in mid-ocean must always involve danger, the loss of life in this case resulted from the attempt to take up the boat on the windward side of the ship, without adequate means for securely fastening the davits to the stern of the boat. The fact remains, however, that these men were lost in rendering service which was hazardous, even in the exercise of the utmost care and skill, and, while it may be said that the accident was in a measure due to their own fault, this fact does not detract from the value of the service actually rendered, and is important only as showing that the dangers which they encountered might have been avoided, had they been willing to remain in the open boat, at considerable discomfort and some risk, because the wind was freshening, until the ship had been turned, so as to enable them to come up on her lee side.

[1, 2] The basis of award is the service rendered. Hence it is quite as erroneous to say that loss of life is to be compensated, as in an action for negligently causing death, as it is to say that there can be no consideration given to the accident, because the men were careless of their own safety. The entire situation must be judged, with all its attendant circumstances, including the accidental loss of life, in an effort to arrive at a just determination of the fair and reasonable value of the salvage service rendered. The elements of value are the value of the ship which was

saved, the nature of the dangers from which the ship and her crew were rescued, the value of the salving vessel, and the dangers which she and her crew incurred in performing the service. The skill, promptitude, and success with which the service was performed, the additional labor imposed upon the members of the crew of the salving vessel, her loss of time and out of pocket expense, must also be taken into consideration.

[3] In this case difficulty arises because of the length of the towage, as compared with the value of the property saved; but in considering such a case it must not be forgotten that the service was necessary to save the ship, which was worth nothing if abandoned to her fate. For this reason too much emphasis should not be placed upon the percentage of salved value to be awarded. The service rendered must be fairly compensated, even if the owners who have recovered their property find the payment burdensome. Except for the men engaged in boat service, there was no great danger to the salvors or their property involved. The service, however, was rendered promptly, skillfully, and with complete success. The total out of pocket expense, including fuel consumed, amounted to $8,372.64. Claim is made that the award should include the cost of insurance and administrative expense, amounting to approximately $1,600, and, in addition, the reasonable value of the ship's time consumed in the service.

[4] In behalf of the Balto it is insisted that the Elkridge had for some time been operated at a substantial loss, was immediately laid up on completion of her voyage, and that consequently no allowance should be made for time lost. It is also insisted that insurance and administrative expense were not increased by reason of the salvage service. If it had appeared that the ship was engaged in a very profitable service, and had actually suffered a loss of profit, this would be an element to be taken into consideration; but the fact that she had on prior voyages incurred a loss does not deprive her of the right to recover the reasonable value of the salvage service rendered, including actual out of pocket expense. General administrative expense and cost of insurance should not, however, be included in out of pocket expense, because those expenses cannot be said to have resulted from the salvage service.

[5] Keeping in mind the elements which are to be considered in determining a salvage award, and the awards which have been made in other cases, I shall fix the amount of the award in this case at $25,000, plus out of pocket expenses of $8,372.64. Of this award the sum of $1,000 shall be apportioned to the personal representatives of the men whose lives were lost, in accordance with their ratings, and the sum of $4,000 shall be apportioned to the members of the crew of the Elkridge according to their rating, except that the seaman Johnson, who was saved, shall be entitled to four portions, according to his rating, and the men who manned the boat which picked him up shall be entitled to double portions, according to their ratings.