## ATLANTIC TRANSPORT CO., Limited, v. UNITED STATES.

### No. C–1087.

Court of Claims.

April 7, 1930.

This case having been heard by the Court of Claims, the court, upon the report of a commissioner, makes the following special findings of fact:

I. The Atlantic Transport Company, Limited, a British limited company, at the time of the filing of the petition and amended petition and during the period of the salvage services in question, was the chartered owner of the British steamship Bardic under the terms of an informal charter arrangement with the vessel owners, the Oceanic Steam Navigation Company, Limited, a British limited company, the terms of which are set forth in certain letters attached to the amended petition marked "Exhibits A, B, and C," which are made a part of this finding by reference.

The Bardic was a steel twin-screw steamship of 8,010 tons gross, 4,916 tons net register, 450.4 feet long, and 58.4 feet beam. She was built in 1919, and at the time of the services in question was of the approximate value of $1,047,932.62.

II. The Powhatan was in 1920 a steel twin-screw steamship of 10,531 tons gross and 6,420 tons net register, 499.3 feet long, 60.2 feet beam, and was built in 1899. At the time of the services in question she was owned by the United States of America and was being operated as an army transport. Her salved value was $650,000, and that of her cargo $600,000.

III. Upon the voyage in question, on January 16, 1920, the Powhatan left New York with cargo, full crew, and 187 enlisted men and one officer for transportation upon a voyage to Antwerp, Belgium.

On the morning of January 18 she broke down at sea; her fireroom became flooded, making it necessary for the crew to draw the fires and leave the fireroom. The ship was therefore without any steam power, and it was accordingly impossible to operate the dynamos which supplied the ship's electrical power.

At 1 p. m. the Powhatan sent out S O S call reading as follows: "S O S.—U. S. A. T.

Powhatan. Lat. 41.05 N., long. 62.10 W. Firerooms flooded, pumps choked, water gaining."

IV. The freighter Western Comet, owned by the United States, was the first to arrive in response to the S O S. She was sighted by the Powhatan at 2:45 p. m. and at 4 p. m. hove to 1½ miles off the Powhatan starboard bow; there then being heavy seas·and strong winds so that it was impossible to render assistance.

V. At the time of the receipt of the S O S, the Bardic was approximately 120 miles west of the disabled Powhatan, which was virtually in the projected course of the Bardic.

Upon receiving the S O S, the Bardic altered her course slightly in order to arrive at the position given by the Powhatan, and sent the following radiogram:

"Commander, Powhatan:

"At 5:30 G. M. T. I was 120 miles west of you. Am steaming toward you at 12 knots. Is your position desperate and 'do you need my assistance?
"Claret, Master 'Bardic.'"

The Powhatan replied:

"Commander, Bardic:

"Will not need your assistance as Cedric is coming. Thank you.
"Randall, Powhatan."

The master of the Bardic, however, continued to proceed toward the Powhatan as developments might render the Bardic's assistance essential. While thus proceeding, the Bardic received the following radio message:

"'Western Comet' and all ships:

"Have requested S. S. Cedric stand by and also request you do same period have 500 persons on board and firerooms partly flooded. Desire ships stand by until result of efforts to raise steam and start pumps is known. "Randall, Master U. S. A. T. 'Powhatan.'"

The Bardic continued toward the Powhatan and came in sight of her and hove to about 10 p. m. At 12 midnight the steamship Cedric approached and stood by, and at 5 a. m. a fourth steamer arrived.

VI. After the arrival of the Bardic, the masters of the Powhatan and Bardic entered into an agreement for the latter vessel to stand by and to tow the former when the weather moderated; this agreement being reached through the exchange of the following radiograms:

"Commander, Powhatan:

"S. S. Bardic now in sight of S. S. Powhatan. Do you require us to stand by?
"Claret, Master."

"Commander, Bardic:

"Which way are you bound and how many passengers can you accommodate?
"Randall, U. S. A. T. Powhatan."

"Commander, Powhatan:

"Bardic bound London. No passenger accommodation. Willing to tow you to Halifax when weather moderates.
"Claret, Master."

"Commander, Bardic:

"Have you any heavy towing gear?
"Randall, Powhatan."

"Commander, Powhatan:

"Yes, a 7-inch steel towing hawser.
"Claret, Master."

"Commander, Bardic:

"Stand by to take us in tow when weather moderates.
"Randall, Powhatan."

"Commander, Powhatan:

"Yes we will comply with your request to stand by for purpose of towing you when weather moderates.
"Claret, Master."

VII. While standing by the Powhatan, the Bardic prepared her equipment for towing. A six-inch steel hawser was laid out on deck and the one end secured to the mainmast. Stop lines of 1½-inch tarred hemp were fastened to the hawser at intervals of 8 to 10 fathoms. The hawser was secured to the deck by these stops, which were fastened to any available projection thereon in such manner as to be subsequently cut or released in sequence by the crew as the hawser was payed out.

By the morning of January 20 everything was complete to commence towing operations. On January 19 the Bardic received a radiogram from the Powhatan giving their noon position, and stating that they had unshackled the port chain ready to shackle to the wire, and requesting that they be given the size of the opening of the jaw required for the shackle. The radiogram also contained the suggestion that the Powhatan request a destroyer to hold the Bardic in position while the ships were connected up, as the Powhatan had no steam and must fleet the wire aboard with capstan and tackle.

VIII. During the morning of the 20th the master of the Bardic received the follow-

ing three messages from the master of the Powhatan:

"Commander, Bardic:

"We are ready with our line.

"Randall."

"Commander, Bardic:

"We are ready when you are.

"Randall."

"Commander, Bardic:

"Will take your line through port bow chock so that if you can keep a bit to lee it will help.

"Randall."

No destroyers were present at that time.

An effort by the Bardic was thereupon made to connect the vessel by means of the towing hawser. The Bardic maneuvered slowly along the windward or starboard side of the Powhatan and fired three rockets with light lines attached. The third rocket was successful in getting a light line across, and several lines of increasingly larger size were passed between the vessels; these lines being hauled aboard the Powhatan by the soldiers and crew. An 8-inch manila hawser was finally hauled aboard the Powhatan leading through the port bow chock, the outer end of this being secured to the 6-inch steel hawser laid out on the deck of the Bardic.

It was necessary for the Bardic to keep as close as possible to the Powhatan to reduce the weight and the length of the hawsers which were being hauled aboard the Powhatan by man power alone. At the same time it was necessary to maneuver the Bardic to hold this position as far as possible so that a collision between the two vessels should be prevented.

The Powhatan, having a great deal of deck structure, drifted with the wind, while the Bardic, a freighter, having very little deck structure and being deeply laden, drifted with the sea, rendering it difficult to maintain the vessels in position. A heavy swell was running and the master of the Bardic was maneuvering the ship in the meantime, trying to hold her in proper position in respect to the Powhatan. A double watch was maintained in the engine room during this period and both starboard and port engines and screws were operating at various speeds during this maneuvering. Due to the force of the wind and sea, the Powhatan with her higher superstructure moved ahead relative to the Bardic so that her bow overlapped the stern of the Bardic. When the ships reached this position, about 20 or 30 fathoms of the steel hawser had been payed out from the Bardic and were being pulled toward the Powhatan.

The Bardic was still on the starboard or weather side of the Powhatan and the 8-inch line which was being heaved in through the port bow chock of the Powhatan. By virtue of the overlapping of the ships, it extended around the bow of the Powhatan, causing a "nip" in the line, and therefore making it difficult to haul in. The master of the Bardic was attempting to work his ship ahead with both engines at this time, which would tend to relieve this situation. With the ships in this position and about 500 feet apart, the rolling and plunging of the ships threw such a strain on the connecting hawsers between them that several of the hemp stops or fastenings securing the wire hawser to the Bardic's deck broke, and about 20 or 30 fathoms of the steel towing wire suddenly slipped overboard from the Bardic and fouled the port propeller which was operating at that time. At the time none of the steel hawser had as yet reached the Powhatan.

The port engine was at once stopped and efforts made for several hours to release the hawser from the propeller. At the time of the accident all available members of the crew were on the deck of the Bardic and in charge of the steel hawser and lines.

The officers and crew of the Bardic used all necessary care in the salvage operations, and the accident was not due to negligence or want of care upon their part.

IX. After attempting for several hours to free her propeller, the Bardic signaled to the Powhatan to pull in the 8-inch manila hawser as much as possible and to cut it, and the Bardic thereupon proceeded to the nearest port, Halifax, by the use of her starboard engine and propeller alone in order to have her port propeller cleared. The Powhatan was left in the company of the steamship Western Comet and the United States destroyers which arrived after the fouling of the propeller.

X. The Powhatan was subsequently towed to Halifax by the Western Comet and by tugboats from Halifax, which had been ordered in the meantime, reaching there on the night of January 27, 1920.

XI. During her trip to Halifax, the Bardic was difficult to steer, as only one propeller was capable of being used and the towing wire dragging from the port propeller tended to swing the boat in a circle. She came to anchor at Halifax 12:50 a. m., January 22. Because of the very low temperature, which was about 12 degrees Fahrenheit, the diver experienced great difficulty in working, but the propeller was finally cleared, and the

Bardic sailed from Halifax for London at 7:35 p. m., January 24.

XII. The expenses incurred at Halifax were as follows:

| | Canadian Dollars. | American Money. |
|---|---|---|
| Harbor master's fee, paid January 27, 1920 ..............$ | 7.00 | |
| Signal station fee, paid January 27, 1920... | 1.00 | |
| Sick mariners' fund fee, paid January 27, 1920 .............. | 73.73 | |
| Inward pilotage fee, paid January 30, 1920 ............. | 51.00 | |
| Outward pilotage fee, paid January 30, 1920 .............. | 26.40 | |
| Shipping men, paid January 28, 1920... | . 2.10 | |
| Towage charges paid January 30–February 16, 1920 ........... | 382.50 | |
| Survey by Lloyds Register of Shipping, paid January 28, 1920 ............. | 30.00 | |
| Note of protest, paid January 30, 1920.... | 2.50 | |
| Survey by London Salvage Association, paid February 4, 1920 .............. | 65.00 | |
| Diver, apparatus and attendants, paid January 30, 1920...... | 480.00 | |
| Medical attendance, paid January 23, 1920 .............. | 20.00 | |
| Taxi hire, paid January 23, 1920......... | 8.50 | |
| Taxi hire, paid January 27, 1920........ | 7.75 | |
| Stevedores, paid January 30, 1920........ | 70.00 | |
| Agency fee, paid February 12, 1920...... | 100.00 | |
| Telegrams and cables, paid February 5, 1920 .............. | 18.93 | |
| Total ...........$ | 1,346.41 | $1,232.099 |
| Overtime of crew assisting divers to clear propeller, paid January 23, 1920 (£4 17 6)...... | | 18.369 |
| Total ................... | | $1,250.47 |

XIII. It has been stipulated and agreed that the rates of exchange for the purposes of this case shall be $3.76827 for the English pound and $0.9151 for the Canadian dollar.

These rates are the average rates over the periods in which plaintiff paid the various items set forth in findings XII, XV, XVI, and XVIII.

XIV. The loss of time on the voyage of the Bardic was from 10 p. m., January 18, at which time the Bardic reached the Powhatan, which was virtually in her original projected course, and entered into the agreement to stand by and tow until 3 p. m., January 25, at which time the Bardic had completed the portion of her trip from Halifax to London, equivalent to returning to the initial position where she had formerly found the Powhatan. The total time was a period of 6 days and 17 hours, or 6.71 days.

XV. By reason of the Bardic standing by the Powhatan, her attempt to tow and the subsequent fouling of the port propeller, and trip to Halifax, all of which consumed a period of 6.71 days, certain items of expense were incurred which have been paid for by plaintiff as follows:

| | English Money. | American Money. |
|---|---|---|
| Provisions at sea per day.£ | 19 4 11 | $ 72.52 |
| Wages at sea per day.... | 47 1 9 | 177.43 |
| Ship's stores consumed at sea per day......... | 29 17 0 | 112.47 |
| Insurance and protection club calls per day..... | 20 11 0 | 77.43 |
| Daily charter hire per day | 77 19 6 | 293.81 |
| Total per day.............. | | 733.66 |
| Total for 6.71 days.............$ | | 4,922.86 |
| Coal consumed while standing by Powhatan, proceeding to Halifax, in Halifax, and returning to position of Powhatan, 229 tons at 132/8d per ton (£1,519 0 8).. | | 5,723.72 |
| Total ....................$ | | 10,646.58 |

XVI. The Bardic arrived in London on February 7, 1920, and, after discharging her cargo, went to dry dock for survey and repairs.

The survey disclosed that the rope guard on the port propeller had been broken away, the guard ring was distorted and out of place, and the check ring for the lignum vitæ bush was buckled and started. This damage, which was caused by the fouling of the port propeller, was repaired; the Bardic being in dry dock two days.

The expenses incurred in dry-docking, in making the above-mentioned repairs, repairing the steel towing hawser, and replacing the rockets and lines, were as follows:

| | English Money | | | American Money |
|---|---|---|---|---|
| Survey by London Salvage Association ... | £7 | 11 | 6 | $ 28.54 |
| Port of London Authority for dry-docking.. | 331 | 2 | 5 | 1,247.66 |
| R. H. Green & Silley Weir, Ltd., repairs.. | 27 | 9 | 0 | 103.43 |
| Bullivant & Co., repairing steel hawser..... | 5 | 10 | 0 | 20.72 |
| Shore gang, labor and material to and from dock ............... | 19 | 19 | 1 | 75.18 |
| Wages and victualling of crew ........... | 117 | 9 | 3 | 442.60 |
| Hawkins & Tipson, to replace lines ....... | 117 | 18 | 11 | 444.52 |
| Jas. Pain & Sons, rockets, etc. ........... | 6 | 15 | 0 | 25.43 |
| Coal consumed going to and from dry dock.. | 79 | 12 | 0 | 299.93 |
| Total .....................$2,688.01 | | | | |

XVII. In order to save time in dry dock, the cast-iron propeller guard which was lost as a result of the fouling of the propeller was replaced by a wrought-iron propeller guard. Two days' time of the Bardic was saved by so doing. A cast-iron propeller guard similar to the one lost, and which is better suited to the purpose for which the propeller guard is designed, would fairly and reasonably have cost $37.68 more than the wrought-iron propeller guard actually installed.

XVIII. The average daily net profit earned by the Bardic, as ascertained by the average daily net profit predicated upon the two voyages prior to and the two voyages subsequent to the one in question, is £215 2 2 or $810.53 computed on this basis, and for the total period of time lost by the Bardic, 8.71 days, this would total a sum of $7,059.71.

Under the terms of the charter one-half of the net profits was retained by the plaintiff, who was charterer of the Bardic, and one-half was payable to the Oceanic Steam Navigation Company, Limited, owner of the Bardic, as part of the charter hire. Each company therefore would have allocated to it one-half of the computed lost net profits, which would amount to $3,529.86, as a result of the Bardic's departure from her own pursuits to assist the Powhatan at the Powhatan's request

XIX. The total of the expenditures at Halifax and London, costs and expenses incurred by the Bardic during the 8.71-day period, and loss of profit, is $21,644.77.

XX. The Powhatan's wireless was in charge of an experienced wireless operator. The ship was equipped with a navy standard 2-kilowatt set with an auxiliary battery of 120 volts. There was also available another storage battery on the ship and some dry cells.

The normal source of energy for the radio equipment of the Powhatan was the ship's electrical plant. This source of energy failed about 4:30 to 5 p. m., January 18, 1920, after her fireroom became flooded. The only energy supply thereafter available comprised the storage batteries and dry cells, which sources would be depleted both in proportion to the extent of use and the degree of power used which is concomitant with the distance or range of desired transmission.

In order to conserve as much energy as possible against any possible contingency, certain messages originating on the Powhatan were relayed or retransmitted by the Bardic which had offered to assist the Powhatan in this respect, and which offer was accepted by the Powhatan's wireless operator.

The Bardic also transmitted a special signal of two dashes and three dashes so that the United States destroyers could locate the position of the Bardic and Powhatan by means of their direction finding apparatus.

It is common or customary practice at sea for one vessel to relay messages for another where the two vessels involved belong to the same wireless company, but there is a charge for this when they belong to different companies.

There is no satisfactory evidence as to what the custom is in an emergency of the character here involved.

XXI. The Western Comet, which was the first vessel to arrive at the Powhatan's position, and which vessel stood by and subsequently took the Powhatan in tow after the fouling of the Bardic's propeller, was equipped with a 2-kilowatt navy standard wireless equipment common to almost all Shipping Board vessels, and had two wireless operators on board. The wireless equipment was in good first-class working condition, and, while standing by, messages were exchanged with the Powhatan.

XXII. On February 7, 1920, a claim on account of the services alleged in the petition was filed with the transportation service of the United States War Department. The

claim was disallowed, and no sums whatsoever have been paid to the plaintiff or to the Oceanic Steam Navigation Company, Limited, or to the master, officers, and crew of the Bardic, or to any of them on account of the matters alleged in the petition.

On or about November 24, 1920, the Oceanic Steam Navigation Company, Limited, filed its libel against the United States of America in the District Court of the United States for the Southern District of New York, alleging as its authority therefor the Act of March 9, 1920 (46 USCA §§ 741–752), and setting out substantially the matters alleged in the petition, and praying for a decree making a liberal salvage award.

On or about June 21, 1921, the United States of America filed its answer, which consisted, among other things, of exceptions to the libel on the ground that the court was without jurisdiction thereof. The court, in fact, had no jurisdiction of the cause of action alleged in the libel under the Act of March 9, 1920, and the suit was discontinued by order dated December 16, 1924.

No actions, except the claim filed with the transportation service of the War Department and the suit filed by the Oceanic Steam Navigation Company, Limited, against the United States in the United States District Court for the Southern District of New York, have been had on the claim alleged in the petition herein in any of the departments or in the Congress or courts of the United States.

XXIII. Neither plaintiff nor the Oceanic Steam Navigation Company, Limited, nor the master or crew of the Bardic, or any of them, has in any way voluntarily aided, abetted, or given encouragement to rebellion against the government of the United States.

XXIV. The plaintiff, Atlantic Transport Company, Limited, and the Oceanic Steam Navigation Company, Limited, are British limited companies.

Citizens of the United States are accorded the right to prosecute against the kingdom of Great Britain cases similar in their nature to that set forth in the petition herein on the same basis and without any conditions or restrictions other than such as are imposed upon citizens of said kingdom of Great Britain.

XXV. The plaintiff brings this suit on its own behalf and on behalf of the Oceanic Steam Navigation Company, Limited, owner of the Bardic, and on behalf of the master and crew of the Bardic at the time of the services rendered to the Powhatan. No other persons or corporations have any interest in the claim, and no assignment or transfer thereof, or any part thereof, or interest therein, has been made. The claim for salvage is stated to have arisen about January 18–21, 1920.

Eugene Underwood, of New York City, for plaintiff.

J. Frank Staley, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen., for defendant.

Before BOOTH, Chief Justice, and WILLIAMS, LITTLETON, GREEN, and GRAHAM, Judges.

GRAHAM, Judge.

This case involves, first, the question whether it is one of salvage or contract; and, second, whether, if it is a case of salvage, it was, under the facts, one in which as a part of the award there should be allowed a sum to make the plaintiff whole for losses and damage to its vessel, the Bardic, incident to its unsuccessful effort to tow the defendant's ship, the Powhatan.

The question whether a case of assistance rendered at sea by one vessel to another is one of salvage or contract depends upon the facts in each particular case, and the burden is upon the party asserting that it was a contract to establish that fact. The Camanche, 8 Wall. 448, 477, 19 L. Ed. 397, The Independence, 2 Curtis, 350, 357, Fed. Cas. No. 7014, and The Excelsior, 123 U. S. 40, 49, 50, 8 S. Ct. 33, 31 L. Ed. 75. We are of opinion that the proof in this case does not establish a contract. On the contrary, it shows that this was a case of salvage—a consent upon the part of the plaintiff to stand by and to tow; no consideration being mentioned and no method fixed by which a consideration was to be determined, no meeting of minds in a contract. It was not what could be called a towage contract or arrangement such as tugs specially equipped for salvage and engaged in that business make, or mere towage of a vessel out of port by a tug. It is " * * * in the interest of commerce and navigation that where a vessel gives a signal of distress and another goes out with the bona fide intention of assisting that distress, and, as far as she can, does so, and some accident occurs which prevents her services being as effectual as she intended them to be, and no blame attaches to her, she ought not to go wholly unrewarded. I think it is for the interests of commerce and of navigation, and also for the encouragement of salvage services generally that some remuneration should be given." The Melpomene, L. R., 4 Adm. and Ecc. 129.

In The Santa Rosa (C. C. A.) 5 F. (2d) 478, 479, the court said, practically upholding the same principle: " * * * It will not do, either because it was not possible to extricate the ship earlier from her perilous position, or because the tugs rendering service at the beginning had not met with success, or that it was believed necessary to call in more powerful and better equipped wrecking vesesls, to whistle down the wind the claims of those who diligently performed their duty and happened unaided not to be successful."

While there are cases which hold that success in the effort to salvage is necessary to an award, there are cases also which hold that it is not. Pro and con the cases are very numerous, and it will serve no good purpose to attempt to harmonize them. It is therefore necessary to invoke some general principle of salvage and see how far it can be applied to the instant case. The court looks with favor upon salvage. It is in the nature of a reward for meritorious services rendered in laborious and perilous enterprises. Bull Insular S. S. Co. et al. v. United States, 62 Ct. Cl. 338, 350, 351. Where a vessel is in distress, in peril and danger, as here, or where the sea is rough and the weather unfavorable and the wind high, or where other facts which usually attend a vessel in distress exist, there is always a risk and danger in rendering assistance. It is easier for another vessel to stay out of the way or to pass by and not attempt to render assistance than it is to undertake the risk of doing so and incur a risk of injury to itself and a possible loss of life and cargo in connection with the effort. It has therefore been the policy of the courts, in order to encourage salvaging and the saving of life and property at sea, to be liberal in the matter of salvage where the vessel has made an honest effort to be of assistance or has joined with others in doing so, whether its efforts resulted in the final saving of the vessel or not, provided the failure of final success was not due to any lack of honest effort and willing purpose to assist.

In The I. W. Nicholas (D. C.) 147 F. 793, the rule was stated to be that "entire" success was not necessary to establish the right to salvage, and in that case it appears there was some service rendered. So in The New Orleans (C. C.) 23 F. 909, some service was actually rendered. The same situation prevailed in the case of The Annie Lord (D. C.) 251 F. 157, 159, where the rule is stated: "It is not necessary, in order to establish a claim to salvage, that the salvor should actually complete the work of saving the property at risk. It is sufficient if he endeavor to do so, and his efforts have a *causal* relation to the eventual preservation of it." (Italics ours.)

And in The Alcazar (D. C.) 227 F. 633, there appeared to be services rendered which placed the imperiled vessel in a position of "greater comparative safety."

So with The Strathnevis (D. C.) 76 F. 855, it was said that complete success was not necessary, but that a contribution to success would entitle to salvage. See also The Flottbek (C. C. A.) 118 F. 954, 960.

In The Veendam (D. C.) 46 F. 489, 491, in distinguishing between mere towage and salvage, it is said: "Such services are treated as salvage when rendered to a disabled ship with the obvious purpose of relieving her from circumstances of danger, either present or reasonably to be apprehended, and not merely to expedite her passage"—citing cases.

In that case the towing vessels actually rendered a service so long as it was necessary.

In The Pendragon Castle (C. C. A.) 5 F. (2d) 56, the salvor acted as convoy and lent men to jettison cargo, and this was held to constitute salvage service. The convoyed vessel was not very leaky, and made port otherwise unassisted. The essential service was convoying.

The Santa Rosa Case, supra, is more nearly in point. Here salvage was allowed tugs that were not sufficiently powerful to float the stranded vessels and whose efforts were without avail. The vessel was later pulled off by a more adequate vessel, a wrecking tug, assisted by two others. Notwithstanding the efforts of the first tugs were unsuccessful, they in fact rendering no contribution to the salvage, salvage was awarded them.

The last case is very much like the plaintiff's case. In fact, plaintiff's case is stronger, because the lack of actual salvage was not due to lack of power or facilities, but due merely to accident incident to service that could not be forestalled.

The Manchester Brigade (D. C.) 276 F. 410, throws some light upon the rule that allows salvage for the encouragement of the service. The Manchester Brigade stood by the distressed vessel and got a towline aboard, but it was slipped later on account of the danger of parting the cable due to heavy seas. When the weather moderated, preparations were made to get the line aboard, but The Manchester Brigade was dismissed in favor

of another vessel which had been ordered up by the distressed vessel's owners to take it in tow. The court awarded salvage, stating: " * * * Where the services of the salvor vessel have been accepted, and she is able and willing to do everything that is necessary to complete the salvage, but is dismissed or superseded for reasons of convenience or economy on the part of the vessel in distress, the services rendered are salvage services and should be rewarded to the same extent and in the same degree as though the service were completed, having regard, of course, as in all salvage cases, to the risks actually encountered in the service and to the time and expenses incurred. That this rule should obtain is in the interest, not alone of commerce, but to encourage assistance to life and property when either are in danger, and requires no citation of authority to sustain it; for otherwise, having regard to the frailties of human nature, there would be little inducement to the masters of vessels to engage in such undertakings and to imperil their own vessels and endanger their own lives if the reward were contingent, not only upon success, but also upon the whim of the owner or master of the vessel in distress." Id., 276 F. 413.

If the reward were also contingent upon absence of a disabling accident, the contingency would resolve itself into a mere chance of success. The contingency of success should be construed as the sort of success that is dependent upon equipment, ability, personal effort, not the success that depends upon accident.

In The Manchester Brigade Case, supra, the award was moderated by the availability of the wireless. Id., 276 F. 414. If such a rule be sound, the bringing in of another salvor through wireless assistance would logically be in the nature of salvage.

In The Flottbek, supra, it is said: "There is a marked and clear distinction between a towage and a salvage service. When a tug is called or taken by a sound vessel as a mere means of saving time, or from considerations of convenience, the service is classed as towage; but if the vessel is disabled, and in need of assistance, it is a salvage service. In cases of simple towage, only a reasonable compensation is allowed, as upon a quantum meruit. In case of salvage, the award is upon a broader and more liberal scale. * * * "

In Huasteca Petroleum Co. v. United States (C. C. A.) 27 F.(2d) 734, 735, the trial court [(D. C.) 14 F.(2d) 495] made no allowance for damage to the St. Heliers by grounding her stern while rendering assistance. However, the Circuit Court of Appeals held: "It is clear that damage sustained by the salving vessel without negligence on her part is a proper element to be considered in determining the award to be given her"—citing The Alabama (D. C.) 280 F. 738; The Edith L. Allen (C. C. A.) 129 F. 209; The Apalachee (D. C.) 266 F. 923; Kennedy v. Crane (C. C. A.) 215 F. 897. See, also, The Elkridge (D. C.) 24 F.(2d) 147.

In the instant case the Bardic's assistance was solicited, and it was notified by the Powhatan that it was ready to take the line, and it attempted to do all that it was asked to do, all that it could do, and its success was prevented by an accident incurred by its effort. It was not a tug engaged in the salvaging business. It first answered the S O S call, was the first ship to arrive in sight and in the neighborhood of the disabled ship, and offered to use what facility it had for towing the Powhatan to a place of safety. The offer was accepted. It was requested to stand by and wait until the weather moderated. This it did. In the meantime it relayed messages which brought other ships upon the scene. When the weather moderated, at a signal from the distressed ship, it undertook to attach to it the steel hawser which it had on board for the purpose of towing. This steel hawser was attached to a manila rope or hawser used for the purpose of drawing it aboard. The Bardic maneuvered, and after several efforts was able to place the end of this manila hawser aboard the Powhatan. The Powhatan began to draw in the manila hawser by passing it through the chock on the port bow side, while the Bardic was on the starboard side. The boats were 500 feet apart, and the sea was rough. The Powhatan, having more of its body above the water than the Bardic, was more easily moved by the wind and the sea, and thus moved faster and ahead of the Bardic. By this overlapping of the ships and the pushing forward of the Powhatan a nip or catch was caused on the bow of the Powhatan which impeded the hauling in of the manila hawser and thus caused a slackening of the line. By reason of this and the plunging of the ships, the fastenings which secured the hawser to the Bardic deck broke, and about 20 or 30 fathoms of steel towing wire suddenly slipped overboard from the Bardic and fouled the port propeller which was operating at that time.

At this time none of the steel hawser had as yet reached the Powhatan. The port engine was stopped on the Bardic and efforts

were made during several hours to release the propeller from the hawser, without success, when the Bardic signaled the Powhatan to pull in the manila hawser that was attached to the steel hawser and cut the steel hawser loose. This done, the Bardic, in its crippled condition, proceeded to the port of Halifax, using her starboard engine and propeller alone, in order to have her port propeller cleared. After having made this and other repairs due to the accident, the Bardic was towed to Halifax by another boat.

The court has found that the breaking of the fastenings holding the steel hawser on the Bardic which caused the accident and the consequent fouling of the propeller of the Bardic was not due to any want of care upon the part of the management of the Bardic. Whether the accident was caused by the attempt by the Powhatan to heave in the hawser through its port bow chock instead of hauling it aboard first and then attaching it or whether it was due to the heavy wind and sea, or a combination of both, what happened might have been avoided if the hawser had first been partially pulled aboard the Powhatan before attempting to pass it through the chock. However, it appears that the accident was not due to any want of care by the Bardic. It does not appear that the action of the wind and the sea had changed during the attempt to put the hawser aboard from what it was before the effort began.

▮ After receiving temporary repairs at Halifax, the Bardic proceeded to London and went into dry dock, where further repairs were made, and was in dry dock there two days for this purpose. The court has found that the repairs so made were made necessary by reason of the accident. We therefore reach the conclusion that a salvage award should be made in favor of the plaintiff in the sum of $9,000, plus the sum of $21,682.46 for expenses, repairs, etc., making a total of $30,682.46, to be distributed to the parties entitled thereto as follows: To the officers and crew of the Bardic the sum of $2,250, and 37½ per cent. or $3,375, each to the Atlantic Transport Company, Limited, charterer, and the Oceanic Steam Navigation Company, Limited, owner, their respective shares of said $9,000, the balance, $21,682.46, to be paid to the plaintiff. The latter sum is made up of expenses incurred as shown by findings XII, XV, and XVI, of additional cost of new propeller guard as shown by finding XVII, and of the loss of profits as shown by finding XVIII. Judgment should be entered accordingly, and it is so ordered.